**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

HUBERT LOWE,
PO Box 386
Omar, WV 25638

MANUEL OJEDA,
PO Box 673
Chapmanville, WV 25508

CARL EGNOR,
85 Hummingbird Drive
Given, WV 25245

JAMES SMITH,
5730 Ripley Road
Cottageville, WV 25239

KEVIN LUTHY,
14F Wheatley Branch Road
Chapmanville, WV 25508

RONALD PAULEY,
50 Sunset Drive
Sumerco, WV 25567

MARK AGUILAR,
PO Box 569
Oceana, WV 24870

BRUCE MILLER
PO Box 523
Sylvester, WV 25193

WESLEY GREENLEE
2800 Turpin Hill Rd.
Lynnville, IN 47619

RICHARD CUNDIFF
3244 Pigeon Valley Road
Booneville, IN 47601

and

Case No.: 2:12-cv-06925
Honorable Joseph R. Goodwin

INTERNATIONAL UNION, UNITED MINE
WORKERS OF AMERICA,
18354 Quantico Gateway Drive, Ste. 200
Triangle, VA 22172

                          Plaintiffs,

v.

PEABODY HOLDING COMPANY, LLC,
701 Market Street
St. Louis, MO 63101

PEABODY ENERGY CORPORATION,
701 Market Street
St. Louis, MO 63101

and

ARCH COAL, INC.
One City Place Drive, Suite 300
St. Louis, MO 63141

                          Defendants.

---

**SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF AND
INTERFERENCE WITH PROTECTED RIGHTS UNDER SECTION 510 OF ERISA**

Plaintiffs, former employees of Defendants Peabody Holding Company, LLC ("Peabody Holding"), Peabody Energy Corporation ("Peabody Energy"), and their subsidiaries (collectively "Peabody") and Arch Coal, Inc. and its subsidiaries ("Arch"), and Plaintiff International Union, United Mine Workers of America ("UMWA"), through their counsel, present this complaint.

**I.    NATURE OF THE ACTION**

1.    Plaintiffs bring this action under 28 U.S.C. Sections 2201 and 2202, on their own behalf and on behalf of similarly-situated former employees of Defendants Peabody and Arch, for the purpose of determining a question in actual controversy between the parties as set forth more fully below.

2.       Plaintiffs also bring this action under Sections 510 and 502(a)(3) of the Employee Retirement Income Security Act of 1974, *as amended* ("ERISA"), 29 U.S.C. §§ 1140, 1132(a)(3) on their own behalf and on behalf of similarly-situated former employees of Defendants Peabody and Arch.

3.       These actions arise out of the unlawful efforts of the Defendants to deprive their respective former employees of employment benefits owed under the terms of their employee benefit plans.  These plans were established through collective bargaining with the UMWA.

4.       Defendants Peabody and Arch implemented corporate schemes to spin-off and otherwise dispose of their largest liabilities, including retiree, pension, and health and welfare benefits, into new corporations, Patriot Coal Corporation ("Patriot") and Magnum Coal Company ("Magnum"), which would inevitably fail. By executing these schemes, Defendants discriminated against Plaintiffs and other similarly situated employees in violation of ERISA Section 510, 29 U.S.C. § 1140.

5.       The named individual Plaintiffs have brought this suit on behalf of themselves and the other approximately 10,000 similarly-situated employees and retirees to have the Court declare the Defendants obligated to maintain Plaintiffs' benefits plans at their current levels and to find the Defendants' actions in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et. seq*.  Plaintiffs seek appropriate legal and equitable relief.

3

II.    **PARTIES**

   **A.  Plaintiffs**

6.    Plaintiff Hubert Lowe was employed by an Arch subsidiary and retired before the sale of assets to Magnum.  Plaintiff Lowe was employed by Arch and its subsidiaries for more than twenty years.  Arch was responsible for contributing to and maintaining Plaintiff's retiree benefits and health and welfare benefits prior to the sale of Magnum.  Following the sale of assets to Magnum and Patriot's purchase of Magnum, Plaintiff Lowe's benefits have been maintained by Patriot. Plaintiff Lowe is a resident of the state of West Virginia.

7.    Plaintiff Manuel Ojeda was employed by an Arch subsidiary and retired before the sale of assets to Magnum.  Plaintiff Ojeda was employed by Arch and its subsidiaries for more than twenty years.  Arch was responsible for contributing to and maintaining Plaintiff's retiree benefits and health and welfare benefits prior to the sale of Magnum.  Following the sale of assets to Magnum and Patriot's purchase of Magnum, Plaintiff Ojeda's benefits have been maintained by Patriot. Plaintiff Ojeda is a resident of the state of West Virginia.

8.    Plaintiff Carl Egnor was employed by a Peabody subsidiary and retired before the spin-off of Patriot.  Plaintiff Egnor was employed by Peabody and its subsidiaries for more than twenty-eight years.  Peabody was responsible for contributing to and maintaining Plaintiff's retiree benefits and health and welfare benefits prior to the spin-off.  Following the spin-off, Plaintiff Egnor's benefits have been maintained by Patriot. Plaintiff Egnor is a resident of the state of West Virginia.

4

9.    Plaintiff James Smith was employed by a Peabody subsidiary and retired before the spin-off of Patriot.  Plaintiff Smith was employed by Peabody and its subsidiaries for more than twenty-four years.  Peabody was responsible for contributing to and maintaining Plaintiff's retiree benefits and health and welfare benefits prior to the spin-off.  Following the spin-off, Plaintiff Smith's benefits have been maintained by Patriot. Plaintiff Smith is a resident of the state of West Virginia.

10.    Plaintiff Kevin Luthy was employed by an Arch subsidiary and terminated by Arch during the sale of assets to Magnum that was effective as of December 31, 2005.  Plaintiff Luthy was employed by Arch and its subsidiaries for more than twenty-two years.  Plaintiff Luthy is currently employed by Apogee Coal Co., LLC, a subsidiary of Patriot and his benefits are currently maintained by Patriot. Plaintiff Luthy is a resident of the state of West Virginia.

11.    Plaintiff Ronald Pauley was employed by an Arch subsidiary and terminated by Arch during the sale of assets to Magnum Coal, Inc. ("Magnum") that was effective as of December 31, 2005.  Plaintiff Pauley was employed by Arch and its subsidiaries for more than twenty-five years.  Plaintiff Pauley is currently employed by Hobet Mining, LLC, a subsidiary of Patriot and his benefits are maintained by Patriot. Plaintiff Pauley is a resident of the state of West Virginia.

12.    Plaintiff Mark Aguilar was employed by a Peabody subsidiary and terminated during the spin-off of Patriot that was effective as of October 31, 2007.  Plaintiff Aguilar was employed by Peabody for over twenty-nine years.  Plaintiff is currently employed by a

subsidiary of Patriot and his benefits are maintained by Patriot. Plaintiff Aguilar is a resident of the state of West Virginia.

13.    Plaintiff Bruce Miller was employed by a Peabody subsidiary and terminated during the spin-off of Patriot that was effective as of October 31, 2007.  Plaintiff Miller was employed by Peabody for over seven years.  Plaintiff is currently employed by a subsidiary of Patriot and his benefits are maintained by Patriot.  Plaintiff Miller is a resident of the state of West Virginia.

14.    Plaintiff Wesley Greenlee was employed by a Peabody subsidiary for twenty years and retired before the spin-off of Patriot. Plaintiff Greenlee's retiree healthcare benefits were deferred vested, meaning that he did not begin collecting his benefits until January 2012. Upon information and belief, pursuant to the NBCWA Liability Assumption Agreement, discussed *supra* at paragraphs 88 and 125, Plaintiff Greenlee's benefits were to be provided by Peabody, but are currently provided by Patriot. Greenlee is a resident of the state of Indiana.

15.    Plaintiff Richard Cundiff was employed by a Peabody subsidiary for twenty-three years and retired before the spin-off of Patriot. Upon information and belief, pursuant to the NBCWA Liability Assumption Agreement, discussed *supra* at paragraphs 88 and 125, Plaintiff Cundiff's benefits were to be provided by Peabody, but are currently provided by Patriot. Cundiff is a resident of the state of Indiana.

16.    Plaintiff International Union, United Mine Workers of America ("UMWA") is a labor organization within the meaning of Section 2(5) of the Labor-Management Relations Act, 29 U.S.C. §152(5), and represented individual Plaintiffs herein for purposes of collective bargaining during their employment with Peabody and Arch and their affiliates and/or

6

subsidiaries and continue to represent those currently employed by Patriot. The UMWA currently represents individual Plaintiffs who are employed by Patriot. The principal office of the UMWA is located at 18354 Quantico Gateway Drive, Suite 200, Triangle, Virginia, 22172. The UMWA also maintains at office at 1300 Kanawha Blvd East, Charleston, West Virginia 25301.

17.    At all relevant times, each of the above named Plaintiffs was a participant and/or beneficiary of the employee benefit plans maintained by Patriot and previously maintained by Peabody and Arch, within the meaning of ERISA Section 3(7) and (8), 29 U.S.C. § 1002(7) and (8).

### B.  Defendants

18.    Defendant Peabody Holding is a limited liability company organized and existing under the laws of the State of Delaware. It is a subsidiary of Defendant Peabody Energy, the largest publicly-traded coal company in the world. Peabody Energy and Peabody Holding are located at 701 Market Street, St. Louis, MO 63101. Peabody Holding, the largest coal producer in the United States, operates mines throughout the nation's coal fields. Peabody Holding conducts business and has offices throughout the United States.

19.    Peabody Holding is an "employer" and a "person" within the meaning of ERISA Section 3(5), (9), 29 U.S.C. § 1002(5) and (9), and at all relevant times was and is an employer engaged in commerce or in any industry or activity affecting commerce.

20.    Peabody Energy is a corporation existing under the laws of the State of Delaware. Peabody Energy conducts business and has offices throughout the United States.

7

21.     Peabody Energy is an "employer" and a "person" within the meaning of ERISA Section 3(5), (9), 29 U.S.C. § 1002(5) and (9), and at all relevant times was and is an employer engaged in commerce or in any industry or activity affecting commerce.

22.     Prior to October 30, 2007, Peabody Energy and Peabody Holding, along with other affiliated and subsidiary corporations, maintained an employee benefit plan covering its employees represented by the UMWA ("UMWA Employees"), retired UMWA Employees and their eligible dependents.  The plan was the product of collective-bargaining between the UMWA and, among others, Peabody subsidiaries.

23.     Defendant Arch is a corporation existing under the laws of the State of Delaware. Its headquarters are located at One City Place Drive Suite 300, St. Louis, MO 63141.  Arch operates mines throughout the nation's coal fields.

24.     Arch is an "employer" and a "person" within the meaning of ERISA Section 3(5), (9), 29 U.S.C. § 1002(5) and (9), and at all relevant times was and is an employer engaged in commerce or in any industry or activity affecting commerce.

25.     Prior to December 31, 2005, Arch, along with other affiliated and subsidiary corporations, maintained an employee benefit plan covering its UMWA Employees, retired UMWA Employees and their eligible dependents.  The plan was the product of collective-bargaining between the UMWA and, among others, Arch subsidiaries.

26.     The Bituminous Coal Operators' Association, Inc. ("BCOA") is an association of employers in the bituminous coal industry that represents its members in collective bargaining with the UMWA.  Prior to 2006, Defendant Peabody owned and directly controlled organized

8

subsidiaries that were members of the BCOA, and were represented by the BCOA for purposes

of collective bargaining with the UMWA.  As recently as 2002, Arch owned and directly

controlled organized subsidiaries that were members of the BCOA and were represented by the

BCOA for the purposes of collective bargaining with the UMWA.

## III.    JURISDICTION AND VENUE

27.    This Court is authorized to enter declaratory relief pursuant to 28 U.S.C. § 2201.

28.    This Court has exclusive subject matter jurisdiction over the claim that

Defendants violated 29 USC §1140 pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §

1132(e)(1), (f).

29.    Venue is proper and this Court has personal jurisdiction over the Defendants

pursuant to 29 U.S.C. §1132(e)(2).  An action brought under 29 USC §1132(e)(2) may be

brought where the breach took place.  Defendants by their actions intended to interfere with

Plaintiffs' attainment of retiree and other benefits and to discriminate against Plaintiffs with

respect to these benefits, many of whom reside in West Virginia.  Accordingly, the breaches

related to the employee benefit plans that are the subject of this suit occurred in this District.

## IV.    HISTORY OF RELEVANT BENEFIT FUNDS

30.    Since shortly after World War II, health and retirement benefits in the coal

industry have been provided to employees through a multiemployer arrangement.  The first coal

industry multiemployer benefit plan was created in an agreement between the UMWA and the

federal government in settlement of a national strike during which the government seized

virtually all of the nation's bituminous coal mines.  Eastern Enterprises v. Apfel, 524 U.S. 498,

504-05 (1998).  The central issue in the strike was the UMWA's proposal that the parties create a health and welfare fund for coal miners.  In an effort to end the strike and avoid further disruption in the coal industry, President Truman issued an executive order on May 21, 1946, directing Secretary of the Interior Julius Krug to seize the mines and to negotiate an agreement with the UMWA.  Id.; Holland v. Keenan Trucking, Inc., 102 F.3d 736, 738 (4th Cir. 1996).  The agreement reached to resolve that strike, known as the Krug-Lewis Agreement, established the program of pensions and lifetime health coverage that continues to this day.  Beginning in 1950, pension and health benefits for both working and retired miners were provided through a single plan, known as the UMWA Welfare and Retirement Fund of 1950.  Id.  Subsequent agreements negotiated between the UMWA and the BCOA, known as the National Bituminous Coal Wage Agreements ("NBCWAs"), maintained this structure.

31.     As members of the BCOA multiemployer bargaining group, Peabody and Arch subsidiaries were signatories to and bound by the NBCWAs and other agreements negotiated between the UMWA and the BCOA.

32.     In the 1974 NBCWA, the single plan structure was abandoned in favor of four separate plans.  These were the UMWA 1950 Pension Plan ("1950 Pension Plan"), the UMWA 1974 Pension Plan ("1974 Pension Plan"), the UMWA 1950 Benefit Plan ("1950 Benefit Plan"), and the UMWA 1974 Benefit Plan ("1974 Benefit Plan").  See Davon, Inc. v. Shalala, 75 F.3d 1114, 1125 (7th Cir.), cert. denied, 519 U.S. 808 (1996).  The two 1950 Plans generally provided health and retirement benefits to miners and their dependents who last worked in covered employment prior to January 1, 1976.  The 1950 Pension Plan provided pension benefits, while

10

the 1950 Benefit Plan provided health and other welfare benefits.  The two 1974 Plans generally provided health and retirement benefits to coal miners who left covered employment on or after January 1, 1976, as well as health benefits to active employees who continued to work under the then-effective 1974 NBCWA.  Id.  Notwithstanding their division into separate plans, these four plans continued to be administered together, and are collectively referred to as the "UMWA Health and Retirement Funds" (the "Funds").

33.     Subsequent to the expiration of the 1974 NBCWA, as the result of difficult and contentious negotiations that included a lengthy industry-wide strike, the system was again changed in the 1978 NBCWA.  Id. at 1118.  Although the 1974 Pension Plan and the two 1950 Plans were left largely unchanged, in order to address employer concerns that the multiemployer approach to retiree healthcare was unraveling as fewer companies remained to participate in the multiemployer plans and an increasing burden was placed on the shrinking group of signatory operators, the role of the 1974 Benefit Plan was substantially altered.  See, e.g., Holland v. Double G Coal Co., 898 F. Supp. 351, 353-54 (S.D. W. Va. 1995).  At that time, primary responsibility for providing health benefits for active miners and retirees, as well as their dependents, was shifted to the individual employers who were required to establish their own separate health plans.  The level of benefits under the new employer plans was to be the same as that provided by the 1974 Benefit Plan.  In order to ensure that each of the Employer Plans was interpreted and applied in a consistent manner, the Union and the employers implemented a "Resolution of Disputes" ("ROD") process requiring that all disagreements regarding the Employer Plans be subject to final resolution by the Funds' Board of Trustees.  Although direct

responsibility for provision of healthcare benefits was now placed upon the employers, the 1974 Benefit Plan was retained as an orphan plan to provide benefits to "retired miners" and their dependents whose last employer was  "no longer in business."  Id.  Moreover, the employers expressly agreed to guarantee the benefits from all four of the pension and benefit plans, as well as each employer's own Employer Plan, for the term of the existing NBCWA.  Id.

34.     After the 1978 NBCWA was negotiated, a series of court decisions recognized that the retirees were entitled to lifetime benefits, but that the employer's obligation was limited to the term of the contract and the 1974 Benefit Plan was obligated to provide the benefits where the employer was no longer signatory.  District 29, UMWA v. Royal Coal Company ("Royal I"), 768 F.2d 588  (4th Cir. 1985); District 29, UMWA v. UMWA 1974 Benefit Plan ("Royal II"), 826 F.2d 280 (4th Cir. 1987);  United Mine Workers of America v. Nobel, 720 F. Supp. 1169 (W.D.Pa. 1989), aff'd, 902 F.2d 1558 (3d Cir.1990).  While affirming that the retirees were entitled to lifetime benefits, these decisions resulted in a number of companies that left the coal business shifting their retiree liabilities to the 1974 Benefit Plan, to be funded by the remaining signatory employers.

35.     During the 1980's, the problems that led to the 1978 restructuring of the collectively bargained multiemployer benefit plans became more acute, and threatened the 1950 and 1974 Benefit Trusts' ability to continue providing health benefits to their beneficiaries.  See UMWA 1992 Benefit Plan v. Leckie Smokeless Coal Co., 99 F.3d 573, 576 (4th Cir. 1996), cert. denied 520 U.S. 1118 (1997)("the number of employers contributing to the plans declined, the number of orphaned miners increased, and the costs of health care soared").  Eastern, 524 U.S. at

511-12; Templeton Coal Co., Inc. v. Shalala, 882 F. Supp. 799, 808 (S.D. Ind. 1995), *aff'd sub nom.* Davon, Inc. v. Shalala, 75 F.3d 1114 (7th Cir.), *cert. denied*, 519 U.S. 808 (1996).  These problems caused substantial disruption in the nation's coal fields, leading to intervention once again by the government of the United States.

36.     During 1989, the UMWA engaged in a bitter and protracted labor dispute with Pittston Coal Company, a major coal producer that had been signatory to the 1984 NBCWA and prior NBCWAs.  The dispute, which resulted in a 10-month strike, centered on the funding of health benefits for retired coal miners and their dependents.  See Davon, 75 F.3d at 1118.  Pittston refused to contribute to the multiemployer benefit funds and cut off health benefits to retirees in its Employer Plan.  This dispute was only resolved after Secretary of Labor Dole intervened and appointed a mediator to facilitate a settlement.  Among other things, the settlement provided for the creation of the Secretary of Labor's Advisory Commission on United Mine Workers of America Retiree Health Benefits (the "Coal Commission"), an industry-wide commission authorized to analyze the retiree healthcare crisis.  Eastern, 524 U.S. at 511-13.  Included among the members of the Coal Commission was Robert H. Quenon.  Mr. Quenon served as the President and Chief Executive Officer of Defendant Peabody Holding Company, Inc., from 1983 to 1990 and served as its Chairman from 1990 to 1991.

37.     In its 1990 report to the Secretary of Labor, the Coal Commission observed that:

Retired coal miners have legitimate expectations of healthcare benefits for life; that was the promise they received during their working lives and that is how they planned their retirement years.  That commitment should be honored.

Coal Comm. Rpt. at 1.  Peabody President Quenon joined in the recommendations and

conclusions of the Coal Commission.

38.      In response to the Report of the Coal Commission, in 1992, Congress passed the

Coal Industry Retiree Health Benefit Act of 1992, codified in relevant part at 26 U.S.C. §§ 9701

et seq. (the "Coal Act").  The Coal Act guaranteed that lifetime health care would continue to be

provided to more than two hundred thousand retired coal miners and dependents.  This guarantee

was implemented in several ways.  First, the statute created the UMWA Combined Benefit Fund

("Combined Fund"), into which the pre-existing UMWA 1950 and 1974 Benefit Trusts were

merged effective February 1, 1993.  The Combined Fund provides health and death benefits to

coal industry retirees who, as of July 20, 1992, were eligible to receive, and were receiving,

benefits from the pre-existing Trusts. 26 U.S.C. § 9703(a), (b)(1), (e), (f).  Second, the statute

mandates the continuation of individual health plans maintained by signatories to the 1978 and

later NBCWAs as of February 1, 1993, which are required to provide benefits to both existing

retirees and beneficiaries and to a limited number of future retired miners and dependents.

26 U.S.C. § 9711.  Finally, Congress created the 1992 Plan to provide health benefits to retirees

who were eligible but not yet covered under previous UMWA benefit plans, and who were not

receiving benefits directly from their former employers and who retired on or before

September 30, 1994.  26 U.S.C. § 9712(b)(2); Keenan, 102 F.3d at 739.

39.      Following the passage of the Coal Act, on December 16, 1993, the UMWA and

the BCOA entered into the National Bituminous Coal Wage Agreement of 1993.  As members of

the BCOA that authorized the BCOA to engage in collective bargaining with the UMWA on

14

their behalf, Peabody's and Arch's organized subsidiaries were signatory to, and bound by, the terms of the 1993 NBCWA.

40.     As part of the negotiations surrounding the 1993 NBCWA, the UMWA and the BCOA negotiated and adopted a uniform individual employer benefit plan to govern the provision of benefits by the BCOA member companies in the multiemployer bargaining group, as well as by other companies that sign "me-too" agreements.  On behalf of their subsidiaries that were members of the BCOA multiemployer bargaining group, Peabody and Arch established "Employer Plans" to provide the benefits to their eligible beneficiaries required under the 1993 NBCWA.

41.     The 1993 NBCWA carried forward the multiple references to benefits "for life" or "until death" that have been construed to create the promise of lifetime benefits. These references were contained in Article XX of the NBCWAs since 1974, in a section designated "General Description of Plan Benefits."   The 1993 NBCWA also added new language that was expressly intended to make it clear that the last employer of a retiree was responsible for providing those benefits, notwithstanding the expiration of the contract:

> The parties *expressly agree* that the language references to "for life" and "until death" that are retained in this General Description *are intended to mean that each employer will provide, for life, only the benefits of its own eligible retirees who retired between February 1, 1993 and the Effective Date, or who retire during the term of this Agreement.*  A retiree shall be considered to be a retiree of an Employer if his last signatory classified employment was with such Employer.  The benefits and benefit levels provided by an Employer under its Employer Plan are established for the term of the Agreement only, and may be jointly amended or modified in any manner at any time after the expiration or termination of this Agreement.  (Emphasis added).

15

Similar language was added to the standard 1993 Employer Benefit Plan negotiated along with the 1993 NBCWA.

42.     The 1993 NBCWA also created a new multiemployer plan for orphaned retirees, the UMWA 1993 Benefit Plan, to replace the 1974 Benefit Plan, which had been merged with the 1950 Benefit Plan and closed to future retirees by the Coal Act.  The intent of the UMWA and BCOA in drafting the 1993 NBCWA is quite clear:  each employer would be responsible for the benefits of its own retirees for the life of the retirees, and the 1993 Benefit Plan would be responsible only if the last employer were both out of business and financially unable to provide benefits.  Furthermore, unlike the old 1974 Benefit Plan, the 1993 Plan's funding was limited to the fixed collectively bargained contribution.

43.     The parties explicitly intended to require each employer to provide benefits for life, and to prevent employers from dumping their retirees on the new orphan fund, and added new language to the 1993 NBCWA to emphasize that intent:

> For purposes of determining eligibility under the 1993 Benefit Plan and Trust, the Employer is considered to be "no longer in business" only if the Employer meets the conditions of (I) and (II) below.  *The parties expressly intend that each of the requirements of (I) and (II) be met.*
>
> (I)     The Employer has ceased all mining operations and has ceased employing persons under this Wage Agreement, with no reasonable expectation that such operations will start up again; and
>
> (II)     The Employer is financially unable (through either the business entity that has ceased operations as described in subparagraph (a) above, including such company's successors and assigns, if any, or any other related division, subsidiary, or parent corporation, regardless of whether covered by this Wage Agreement or not) to provide health and other non-pension benefits to its retired miners and surviving spouses. (Emphasis added).

16

44. Prior to the 1993 NBCWA and the Coal Act, the Royal I decision limited the obligation of an employer to the term of the agreement.  Subsequent court decisions, including Royal II and Nobel, required the 1974 Benefit Plan to provide lifetime benefits if those benefits ceased to be provided by the employer, either because it ceased to operate or otherwise ceased to be bound by a successor NBCWA.  In effect, under those decisions, the retiree obligation "shifted" or was transferred from the employer to the 1974 Plan at the expiration of the agreement if the employer did not sign a successor agreement.  The 1993 NBCWA was specifically intended to change that result, placing a permanent lifetime obligation on the last signatory employer.  "The most immediate problem under the 1974 NBCWA, as interpreted by the courts, was that employers' obligations to provide benefits ceased once they were no longer signatories to the contract.  The new 1993 provision altered that situation by making it clear that the employers' obligation to provide health benefits continued for the life of the employer, not simply for the life of the collective bargaining agreement."  District 17, UMW v. Brunty Trucking Co., 269 F. Supp. 2d 702, 708-09 (S.D.W. Va. 2003).

45. The UMWA and the BCOA have negotiated a number of NBCWAs since 1993, including the 1998 NBCWA, the 2003 NBCWA, the 2007 NBCWA and the currently-effective 2011 NBCWA.  Each and every NBCWA has continued the permanent lifetime obligation to provide health care to eligible beneficiaries. A true and correct copy of the relevant portions of the 2007 NBCWA related to health and retirement benefits is attached hereto as Exhibit 1.[1] A

---

[1] A number of the attached exhibits are quite lengthy.  In order to avoid burdening the record and in the interests of brevity, only the material portions of the documents are attached.  Plaintiffs will provide a complete copy of any exhibit upon request.
.

true and correct copy of the relevant portions of the 2011 NBCWA related to health and retirement benefits is attached hereto as Exhibit 2.

46.     Arch was last a signatory to the 2002 NCWA and its  subsidiaries continued to sign "me-too" agreements adopting without change the terms of the NBCWA in 2007.  Although Peabody subsidiaries ceased to be members of BCOA in 2006, they too executed "me-too" agreements binding the organized subsidiaries to the 2007 NBCWA without change. True and correct copies of the 2007 "me-too" agreements signed by Peabody subsidiaries are attached hereto as Exhibit 3.

## V.     BACKGROUND OF THE TRANSACTIONS THAT VIOLATE ERISA SECTION 510

### A.  Arch Coal and the Sale of Assets to Magnum

47.     U.S.-based Arch is a top-five global coal producer and marketer, with 157 million tons of coal sold in 2011.  Arch's core business is supplying cleaner-burning, low-sulfur thermal and metallurgical coal to power generators and steel manufacturers on five continents.  Arch was formed in July 1997 through the merger of publicly traded Ashland Coal, Inc. and privately held Arch Mineral Corporation. Arch Mineral had its origins in 1969, when it was formed as a partnership between Ashland Oil (now Ashland Inc.) and the Hunt family of Dallas, Texas; Ashland Coal was formed in 1975 as a wholly owned subsidiary of Ashland Oil. With the completion of the merger, Arch became the leading producer of low-sulfur coal in the eastern United States.  Arch purports to be the most diversified American coal company with mining complexes across every major U.S. coal supply basin.  In total, it claims to provide 15% of

America's coal supply from mining complexes in Wyoming, Utah, Colorado, Illinois, West Virginia, Kentucky, Virginia and Maryland.

                i.      <u>Arch's Obligation to Maintain Benefits and its Joint Administration of Benefits Under Successive NBCWAs</u>

48.     Subsidiaries of Arch or its predecessors have been signatory to various NBCWAs. Apogee Coal Company, Arch of Alabama, Arch on the Green, Arch of Kentucky, Arch of Illinois, Arch of West Virginia, Hobet Mining, Inc. and Cutler Mining Company were all signatories to the 1993 NBCWA.  Apogee Coal Company, Arch of Alabama, Arch on the Green, Arch of Kentucky, Arch of Illinois, Arch West Virginia, Hobet Mining, Inc. and Cutler Mining Company were also signatories to the 1998 NBCWA.  Arch subsequently consolidated a number of its subsidiaries into Apogee Coal Company, which was a signatory to the 2002 NBCWA, which was also signed by Hobet Mining, Inc.

49.     Arch and its organized subsidiaries maintained an employee benefit plan pursuant to the terms of each successive NBCWA. The plan was commonly administered, maintained and funded for the mutual benefit of Arch and its subsidiaries such that they constituted a joint venture. Correspondence between Arch and the UMWA, its officers, and its membership show that Arch administered its benefit obligations in a singular, undifferentiated system on behalf of its subsidiaries.

50.     For example, in 2005, following the enactment of Medicare's prescription drug program, Arch sought to require its retirees to enroll in Part D at their own expense.[2]  In a letter to Arch's retirees dated August 2005, Ilene K. Knobler, Arch's Director of Benefits, stated:

---

[2] These actions were subsequently determined to have been violations of both the NBCWA and the Coal Act.

> **The Company will require Medicare-eligible plan participants to enroll in a Medicare Part D Plan effective January 1, 2006.**

(Emphasis in original.)  A true and correct copy of this letter is attached hereto as Exhibit 4.   In a subsequent letter, Ms. Nobler further stated:

> [T]he **Company** has decided to coordinate or "wrap" the existing prescription drug benefit around the Medicare Part D benefit.
>
> * * *
>
> Q.      What happens if I don't enroll in a Medicare Part D plan?
>
> A.      Your prescription drug benefits provided by the **Company** will terminate effective January 1, 2006.

(Emphasis added.)  A true and correct copy of the letter is attached hereto as Exhibit 5.  Both letters were written on Arch letterhead and, upon information and belief, were sent to all of Arch's retirees without regard to which specific subsidiary they retired from.

51.      Additionally, Arch continued to pay healthcare benefits to retirees of subsidiaries that were no longer in operation. These subsidiaries included Amherst Coal Company, Arch of Alabama, Inc., Arch of Illinois, Inc., Arch of Kentucky, Inc., Arch on the Green, Inc., Enoxy Coal, Inc., Hobet Mining & Construction Co., Inc., Huntington Rail & River Corp., Old Hickory Coal, Pipestone Creek Coal Mining Inc., Sharples Coal Corp., and Zapata Coal Corp.

52.      Arch also provided all responses with regard to RODs filed against any of its subsidiaries to the Trustees of the Funds. For example, Arch responded to a ROD on behalf of its subsidiary Hobet Mining, Inc., a copy of which is attached hereto as Exhibit 6, and attached hereto as Exhibit 7, Arch responded to a ROD on behalf of its subsidiary Apogee Coal Co.

ii.   Arch's Sale of Assets to Magnum

53.    ArcLight Capital Partners LLC ("ArcLight Capital") is a private equity firm that specializes in energy, which was involved in the sale of certain Arch subsidiaries to Magnum. Created in 2001, among ArcLight Capital's first acquisitions were several coal mining operations and coal reserves from Trout Coal Holdings LLC.  These operations were acquired through ArcLight Capital's hedge funds, ArcLight Fund I and ArcLight Fund II.

54.    On August 9, 2005, Arch Coal and ArcLight Capital, through its hedge funds, announced a letter of intent to form a joint venture with Arch to combine the coal holdings of Trout Coal with certain mining operations and reserves of Arch Coal, including all of its UMWA signatory operations. ArcLight Capital Press Release, August 9, 2005, attached hereto as Exhibit 8. The new company was to be called Magnum Coal with stock publically available. Magnum was created by articles of incorporation on October 5, 2005 by ArcLight Energy Partners Fund I, L.P.  See Patriot Coal Corp., Definitive Proxy Statement (Schedule 14A), at 13 (June 17, 2008), relevant excerpts attached hereto as Exhibit 9.

55.    On October 7, 2005, ArcLight Capital and Arch signed a Master Contribution Agreement that laid out the mines and coal reserves that the companies would contribute to the new company. Arch proposed to contribute Hobet Mining, Apogee Coal Company, and Catenary Coal Company, which included the Hobet 21, Arch of West Virginia, Sharples and Campbell's Creek operations and 455 million tons of reserves.  ArcLight proposed to contribute its Panther, Remington, Jupiter and Dakota mines.  ArcLight would own 62.5% of the new company and

21

Arch Coal would own 37.5%. Arch Coal, Inc., Master Contribution Agreement, at 1-2, attached hereto as Exhibit 10.

56.     This Master Contribution Agreement was ultimately replaced by a Purchase and Sale Agreement. Under the Purchase and Sale Agreement, Arch sold all the stock of Hobet Mining, Apogee Coal Company and Catenary Coal Company to Magnum for approximately $15 million, "subject to certain adjustments and the assumption by Magnum Coal Company of certain liabilities." Arch Coal Inc., Current Report (Form 8-K), at 1-2, (January 6, 2006), attached hereto as Exhibit 11.

57.     On December 31, 2005 the companies signed the Purchase and Sale Agreement that replaced the Master Contribution Agreement, attached hereto as Exhibit 12.  As a result of the sale, Arch no longer employed any miners represented by the UMWA.

58.     Under the Purchase and Sale Agreement, Arch agreed to perform certain stand-alone corporate support functions for Magnum for a period of time.  In addition, Arch required Magnum to enter into certain sales contracts under which Magnum was required to supply coal at prices previously agreed to by Arch in exchange for a fee equal to the amount that was due to Arch under such contracts. See Exhibit 12.

59.     Under the contemplated Master Contribution Agreement, Arch considered establishing a Hobet Voluntary Employees' Beneficiary Association ("VEBA") and an Apogee VEBA, for the benefit of former employees of Arch and its subsidiaries who 1) by virtue of their employment under the NBCWA were or would become entitled to receive retiree medical benefits or 2) was a former salaried employee of one of those entities who was currently

22

receiving retiree medical benefits. Arch would have contributed nearly $216 million in assets to these VEBAs. Exhibit 10, Arch Coal, Inc., Master Contribution Agreement, at 2. In the Purchase and Sale Agreement that was executed, however, Arch only contributed $7.5 million to each VEBA, for a total of $15 million. Exhibit 12 at 1.

60.     Magnum initially started with only the assets purchased from Arch Coal. On March 21, 2006, through a recapitalization, Magnum acquired coal mining operations and coal reserves previously associated with Trout Coal Holdings LLC.  Exhibit 9, at Annex F-7.

61.     ArcLight Equity Partners I, L.P. and ArcLight Equity Partners Fund II, L.P. were majority stockholders (54.4%) of Magnum.  Exhibit 9, at Annex F-7. Following the sale, the two companies – ArcLight Capital and Magnum – shared management. Robb E. Turner was both Chairman of Magnum and Senior Partner of ArcLight Capital Partners. Paul Vining, Senior Vice President for Marketing and Trading at Arch Coal (and a former Peabody executive) was named President and CEO of Trout Coal and held the same position at Magnum upon its formation.  See Exhibit 8.

       iii.     Arch's Retiree Healthcare Liabilities as a Motivating Factor Behind the Decision to Sell Assets to Magnum

62.     Eliminating post-retiree healthcare liabilities from its balance sheet was an express purpose of Arch's sale to Magnum. As a result of the Arch-ArcLight-Magnum transaction, Arch transferred 12.3% of its assets to Magnum and 96.7% of its Other Post-Employment Benefit ("OPEB") liability.

63.     Arch disclosed in its September 30, 2005 pro-forma financial statements that its assets sold to Magnum would result in a reduction of its postretirement liabilities from $402 million to $56.8 million, a reduction of approximately 85%. Exhibit 11 at exhibit 99.1.

64.     As Arch stated in a January 3, 2006 press release:

As a result of the sale, Arch expects to record a small net gain during the fourth quarter of 2005, which includes the write-off of an estimated $50 million to $60 million of below-market legacy sales contracts retained in the transaction and a charge of $70 million to $80 million related to *previously unrecognized actuarial liabilities associated with post-retiree health care.*

The transaction is expected to be accretive to Arch's earnings and EBITDA in 2006. In addition, the transaction has resulted in a substantial reduction in Arch's legacy liabilities. Had the transaction occurred at September 30, 2005, the book liabilities associated with these operations *would have included approximately $450 million of post-retiree healthcare, workers' compensation and reclamation obligations*, or $520 million to $530 million including the $70 million to $80 million charge discussed above. Arch expects similar reductions to these liabilities once it closes its books for 2005 and records the impact of this transaction.  (Emphasis added.)

Arch Coal Press Release, January 3, 2006, attached hereto as Exhibit 13

65.     Furthermore, following the sale, Arch CEO Steve Leer stated "the sale of these assets has transformed our balance sheet and created a strong foundation for continued growth in the future." Arch Coal Press Release, February 10, 2006, at 2, attached hereto as Exhibit 14. "As of December 31, 2005, Arch's legacy liabilities — which the company defines as postretirement medical, workers' compensation and reclamation — stood at $285.5 million, compared to $704.9 million at December 31, 2004. Of the total remaining, approximately $177.4 million is related to reclamation." Exhibit 14, at 5. A January 4, 2006 article in the St. Louis Post-Dispatch further

reported that "Arch instead opted to sell the operations for an unspecified amount of cash and to rid itself of millions of dollars in retiree healthcare costs and environmental liabilities."

### B. Peabody and the Spin-off of Patriot

66.     Peabody is one of the largest private-sector coal companies in the world, owning interests in 30 coal mining operations in the United States and Australia. Although Peabody Energy incorporated in Delaware in 1998 and became a public company in 2001, Peabody traces its history in the coal industry to 1883, upon the founding of the retail coal supplier Peabody, Daniels and Co.

> i.     Peabody's Obligation to Maintain Benefits and its Joint Administration of Benefits Under Successive NBCWAs

67.     For many decades, numerous subsidiaries of Peabody or its predecessors were members of the BCOA and signatory to numerous NBCWAs.  The 1993 NBCWA confirmed the signatory employers' responsibility to provide lifetime health care to their covered employees and their dependents.  Numerous subsidiaries of Peabody Holding continued to be members of the BCOA, and signatory to NBCWAs, throughout the 1990s and were signatory to the 1993, 1998, and 2002 NBCWA.

68.     Before commencement of bargaining that resulted in the 2007 NBCWA – the immediate successor to the 2002 NBCWA  – commenced, Peabody subsidiaries resigned from the BCOA.  After the BCOA and the UMWA entered into the 2007 NBCWA, Peabody subsidiaries agreed to be bound by the provisions of that contract.

69.     Peabody and its organized subsidiaries maintained an employee benefit plan pursuant to the terms of each successive NBCWA from the 1978 NBCWA through and including

the 2007 NBCWA in order to provide benefits to their UMWA Employees, their retired UMWA employees not covered by the Coal Act, and their dependents.  The plan was commonly administered, maintained and funded for the mutual benefit of Peabody and its subsidiaries such that they constituted a joint venture.

70.    Correspondence between Peabody Holding and Peabody Energy and the UMWA, its officers and its membership reflects that Peabody administered its benefit obligations in a unified, singular, undifferentiated system on behalf of its subsidiaries.

71.    In 2005, following the enactment of Medicare prescription drug coverage (known as "Part D"), Peabody sought to require its retirees, including those covered by the NBCWA and the Coal Act, to enroll in Part D at their own expense. [3]  In a notice to Peabody's retirees dated August 2005, Peabody stated:

> Effective January 1, 2006, Medicare will offer a new Medicare Part D Prescription Drug Benefit. As you are aware, your benefit plan requires enrollment in any Medicare plan for which you are eligible; therefore, you are required to enroll in a Medicare Part D plan to qualify for prescription drug coverage under your Peabody benefit plan.

The notice was sent on "Peabody" letterhead that defined "Peabody" as follows:

"Peabody includes all subsidiaries and affiliates of Peabody Energy Corporation."

A copy of the August 2005 notice is attached hereto as Exhibit 18.

72.    As a follow-up to its earlier notice, in December 2005, Peabody's Medicare-eligible retirees were sent an information sheet entitled "News You Need About Enrollment for Your New Medicare Part D Prescription Drug Benefit."  The information sheet was on "Peabody" letterhead, which was defined to include:  "all signatory subsidiaries and affiliates of

---

[3] These actions were subsequently determined to have been violations of both the NBCWA and the Coal Act.

Peabody Holding Company, Inc."   The information sheet further refers to "Peabody's preferred medication list" and "secondary coverage under your Peabody Plan."  In the event participants had questions, they were instructed to "call the Peabody Benefits Call Center," not their individual employers. A true and accurate copy of this information sheet is attached hereto as Exhibit 19.

73.    In response to the contention by the UMWA that Peabody's actions regarding Medicare Part D violated the NBCWA and the Coal Act, Peabody Holding corresponded with the UMWA regarding these changes on behalf of all Peabody Affiliates, and the UMWA was asked to sign a HIPAA Confidentiality agreement with Peabody Investments Corp., as the Plan Administrator for eleven subsidiaries that had employed UMWA members, including subsidiaries that were no longer operating. True and correct copies of the correspondence regarding the Medicare Part D changes including the Confidentiality Agreement are attached hereto as Exhibit 20.

74.    Moreover, in the common administration of its benefit plan , Peabody Holding sent Summary Annual Reports to all participants and their beneficiaries in its plan, which covered all employees of Peabody Holding and its affiliates. The Summary Annual Reports provided insurance information concerning the plan and outlined the participants' rights to obtain additional information, including a full copy of the annual report, a statement of assets and liabilities of the plan, and a statement of income and expenses of the plan. A true and accurate copy of the cover-page of 2006 Summary Annual Report is attached hereto as Exhibit 15.

27

75.     In a December 14, 2006 letter to UMWA President Cecil Roberts, Peabody Holding notified the Union that Liberty Life Assurance Company would begin administering the Sickness and Accident Benefit Programs pursuant to the 2002 NBCWA, as opposed to self-administering the benefits. This letter was sent from Jiri Nemec of Peabody Holding "as agent for" thirteen Peabody subsidiaries, including four subsidiaries – Affinity Mining Co., Squaw Creek Coal Co., Sterling Smokeless Coal Co., and Martinka Coal Co. – that had not operated or employed any workers represented by the UMWA for a substantial period of time.. Nevertheless, the previous employees of these four subsidiaries continued to receive benefits through Peabody. A true and accurate copy of this letter is attached hereto as Exhibit 16.

76.     In further showing that Peabody acted on behalf of its subsidiaries in a unified manner, Jiri Nemec of Peabody Holding was also the President of each of the four subsidiaries that were no longer operating. Through Nemec and Peabody, these four subsidiaries informed the UMWA, in identical letters mailed on January 16, 2007, that they would not be resuming mining operations and the UMWA-represented employees who worked at the facilities were "afforded all rights to which they were entitled" under the applicable labor agreements. True and accurate copies of these letters are attached hereto as Exhibit 17.

77.     There are numerous other examples demonstrating that Peabody administered the benefit plan in a singular way for all its subsidiaries. When the UMWA inquired about an individual member's benefit claims, it received a response from Peabody, not from the individual subsidiary. See true and accurate copies of two such letters attached hereto as Exhibit 21, showing response from Peabody Holding, Benefits Administration, "For all Peabody affiliates."

Peabody conducted health benefit meetings for its retirees of Peabody Holding and its affiliates. A copy of a meeting announcement for Peabody Retirees from Peabody Holding is attached hereto as Exhibit 22. Peabody also provided all responses with regard to RODs filed against any of its subsidiaries to the Trustees of the Funds. See, August 10, 2001 letter from Peabody Energy on behalf of its subsidiaries concerning ROD Decision 98-0, reinstating medical coverage for certain disabled miners, attached hereto as Exhibit 23. See also, ROD filed by an employee of Eastern Associated Coal and the corresponding response from Peabody Energy, attached hereto as Exhibit 24.

78.     When UMWA-represented participants sought to receive reimbursement for prescriptions, they were obligated to complete a "Prescription Drug Program Direct Member Reimbursement Form" which listed "Peabody Holding Company, Inc." as the Group/Employer Name. A true and accurate copy of the Reimbursement Form is attached hereto as Exhibit 25. All employees and retirees participating in the prescription drug plan were issued a Prescription Solutions card, with "Peabody" printed on the top, regardless of which individual subsidiary they were directly employed by. A true and accurate copy of one such Prescription Drug Card is attached hereto as Exhibit 26.

79.     When an employee retired, he received a letter from either Peabody Holding or Peabody Energy advising him that the benefit plan now reflected his retirement and providing him with relevant information related to his retiree benefits. True and correct copies of three such letters are attached hereto as Exhibit 27.

29

80.     Peabody not only administered its benefit plan in a unified way with respect to subsidiaries employing UMWA members, it also did not differentiate among its subsidiaries when dealing with other matters affecting terms and conditions of employment. For example, Peabody Energy sent a letter to the Union in 2004 explaining that its subsidiaries would incorporate the new West Virginia law lowering the alcoholic concentration that an individual may have in his/her blood to .08% for purposes of the individual being found to be driving or operating a vehicle under the influence. A copy of this letter is attached hereto as Exhibit 28.

ii.     Peabody's Spin-off of Patriot

81.     On October 31, 2007, Peabody Energy, the corporate owner of Peabody Holding and its subsidiaries, contributed portions of its eastern U.S. mining operations to a newly-formed subsidiary known as Patriot in exchange for shares of Patriot common stock.  The terms of the spinoff, transition and post-spinoff relationship between Peabody Energy and Patriot were set forth in a Separation Agreement and series of related agreements.  Portions of these agreements were filed with the SEC on October 22, 2007.  Peabody Energy Corp., Current Report (Form 8-K), at Exhibit 10.1 (Oct. 22, 2007), attached hereto as Exhibit 29.

82.     Peabody Energy, in turn, distributed to its shareholders all of the outstanding shares of Patriot common stock.  As a result, on October 31, 2007, Patriot became an independent corporate entity, the shares of which were traded on the New York Stock Exchange. Patriot Coal Corp., Annual Report (Form 10-K), at 4 (March 14, 2008), attached hereto as Exhibit 30.

83. The Board of Directors of Peabody considered the following potential benefits in making the determination to effect the spin-off. In evaluating these potential benefits, Peabody's Board considered Patriot's capital structure, debt levels and *retiree healthcare liabilities* and the effect on Patriot of the agreements being entered into with Peabody in connection with the spin-off.

> *Patriot's operations in Appalachia and the Illinois Basin represent a unique set of commercial and operational profiles.* Patriot's operations in Appalachia and the Illinois Basin differ from Peabody's operations in several respects, including: geologic characteristics of the coal reserves, mining conditions, *workforce management approaches*, business and regulatory environment, mine size, coal qualities and supply/demand dynamics. Peabody's management believes that a management team focused on these unique aspects will better position Patriot to maximize its operating performance.
>
> * * *
>
> With its strong presence in Central Appalachia, Patriot will be well-positioned to be a consolidator within that highly fragmented region. . . . As an independent entity, Patriot will not compete with Peabody's other operations for capital. Instead, Patriot will be in a position to pursue strategies its Board and management believe will create long-term stockholder value, including *acquisition* and organic growth opportunities in *the highly fragmented Central Appalachian region.* (Emphasis added.)

Peabody Coal Corp., Information Statement to Stockholders, at 25 (October 22, 2007), a copy of which is attached hereto as Exhibit 31.

84. As a result of the spin-off, Patriot became the independent parent of sixty-four subsidiaries. Among the assets contributed to Patriot was Peabody Energy's ownership interest in eleven subsidiaries – Affinity Mining Co., Colony Bay Coal Co., Eastern Associated Coal, LLC, Marktinka Coal Co., LLC, Mountain View Coal Co., LLC, Heritage Coal Co., LLC (formerly Peabody Coal Company), Pine Ridge Coal Co., LLC, Sterling Smokeless Coal Co., LLC, Rivers Edge Mining Inc., Squaw Creek Coal Co., and Yankeetown Dock, LLC – which were current or

31

past signatories to NBCWAs providing lifetime healthcare benefits to miners, retirees, and their dependents.  Six of these subsidiaries– Peabody Coal Co., LLC (now Heritage Coal), Colony Bay Coal Co., Eastern Associated Coal LLC, Mountain View Coal Co., LLC, Pine Ridge Coal Co., LLC, and Rivers Edge Mining Inc. – were signatories to the 2007 NBCWA. Five of these subsidiaries – Affinity Mining Co., Squaw Creek Coal Co., Sterling Smokeless Coal Co., Martinka Coal Co., and Yankeetown Dock LLC – had not been operating for a substantial period of time.

85.    In May 2007, Peabody met with the UMWA to provide a general overview of its plan to transfer shares of Peabody Coal Company, LLC to Patriot Coal. In August 2007, Peabody Holding and Peabody Coal presented to the UMWA for countersigning an Acknowledgment and Assent ("A&A"), which explained the manner in which the retiree healthcare obligations would be paid by Peabody after the spin-off. A true and accurate copy of the A&A is attached hereto as Exhibit 32.  At the time the A&A was presented to the Union, it was not in a position to confirm or contest the representations contained therein. Accordingly, in signing the A&A, the Union only agreed not to object to Peabody Holding entering into an agreement with Peabody Coal or Patriot to allow Peabody Holding to pay for the health care of the retirees as described within the A&A.

86.    Contemporaneous with the spin-off, Peabody and Patriot reached several other agreements, two of which were entitled:  a "Coal Act Liabilities Assumption Agreement" and an "NBCWA Individual Employer Plan Liabilities Assumption Agreement."

87.     In the Coal Act Liabilities Assumption Agreement, Peabody Holding acknowledged that it would remain a "related person" to Patriot, and therefore remained liable for the provision of healthcare benefits to retirees under the Coal Act.  The agreement further provided that Patriot would administer Coal Act plans and the delivery of Coal Act benefits. Peabody Holding indemnified Patriot against any claims arising out of a failure of Peabody to timely meet its Coal Act obligations. A true and correct copy of the Coal Act Liabilities Assumption Agreement is attached hereto as Exhibit 33.

88.     In the NBCWA Individual Employer Plan Liabilities Assumption Agreement, Peabody Holding agreed to assume Patriot's liabilities for provision of retiree health care for certain retirees and dependents of Peabody Coal Co., LLC (now Heritage Coal) who had a vested right to receive benefits under the applicable collective bargaining agreements as of December 31, 2006, and had retired prior to that date.  Peabody Holding guaranteed payment of this obligation and indemnified Patriot against any failure by Peabody Holding to meet its obligations under the agreement. A true and correct copy of the NBCWA Individual Employer Plan Liabilities Assumption Agreement is attached hereto as Exhibit 34.

89.     Without Peabody's assumption of these healthcare obligations, Patriot would have shown a negative net worth on its *pro forma* financial statements, which would have both jeopardized the intended tax-free nature of the distribution of Patriot's shares to the shareholders of Peabody Energy and constituted an obvious fraud on Peabody's creditors.  Upon information and belief, in order to make Patriot appear solvent at the time of the spin-off, Peabody Energy assumed $615.8 million dollars of retiree health care and other liabilities, while transferring

$554.7 million in retiree healthcare liabilities to Patriot. Patriot Coal Corp., Annual Report (Form

10-K), at Annex F-32 (March 2, 2009), attached hereto as Exhibit 35.

           iii.     Peabody's Retiree Healthcare Liabilities as a Motivating Factor Behind the Decision to Spin-off Patriot

90.     Peabody reaped tremendous gains as a result of the spinoff.  On Peabody Energy's

3Q 2007 Earnings Conference Call, Peabody CEO Rick Navarre bragged of "significantly lower

legacy liabilities as a result of the spinoff." He explained:

> Our retiree, healthcare liability and related expense will be reduced by about 40%. Workers' compensation liability will be cut nearly 90% and asset retirement obligations will be one-third lower and the combined fund and multi-employer [Coal Act] obligations will now fully reside with Patriot. In total, our legacy liabilities, expenses and cash flows will be nearly cut in half.

Navarre further stated:

> Our portfolio was now comprised of assets with longer average lives, we have reduced our operating risk and cost profile, we've lowered our per ton capital costs, we've cut our legacy liabilities and related uncertainties, and we've given the company a greater focus on high growth, high margin opportunities. And Peabody is extremely well positioned now to benefit in the robust international markets as well as the strong U.S. dynamics. 3Q 2007 earnings call.

Peabody Energy 3Q 2007 Earnings Call, at p. 3 (Nov. 6, 2007). A copy of the transcript of this

call is attached hereto as Exhibit 38.

91.     In the spin-off to Patriot, Peabody moved 16.2% of its assets to Patriot while

reducing its OPEB liability by 58.9%. Before the spin-off, Peabody's legacy liabilities totaled

19.6% of its total assets. After the spin-off, that percentage dropped to 12.6%.

92.     Patriot's first annual report filed after the spinoff showed $1.2 billion in assets and

$1.1 billion in liabilities. Exhibit 30 at Annex F-4.

93.     Patriot assumed these massive legacy liabilities under the direction of Peabody management. Leadership at Peabody Energy who orchestrated the creation of Patriot and the dumping of significant liabilities, including Irl Engelhardt, resigned from Peabody's Board of Directors to become Directors of Patriot.  According to a submission made by Patriot to the SEC, the "terms of the spinoff, including the financial terms of the arrangements between Peabody and Patriot that continue after the spinoff, were determined by persons who were at the time employees, officers or directors of Peabody or its subsidiaries and, accordingly, had a conflict of interest." Patriot Coal Corp, Registration Statement (Form S-4), at 21 (May 14, 2008), attached hereto as Exhibit 36.  Engelhardt, the former Chairman & CEO of Peabody Energy, served as the Chairman of Patriot's first Board of Directors and the company's inaugural management team was comprised entirely of persons who had accumulated significant high-level experience with Peabody, as reflected in the following chart:

| **Patriot Executive/Director** | **Former Position(s) with Peabody** |
|---|---|
| Richard Whiting (President & CEO) | Executive VP (2002-2007) President & COO (1998-2002) |
| Mark N. Schroeder (SVP & CFO) | President, Peabody China (2006-07) Executive VP (2002-06) |
| Jiri Nemec (SVP & COO) | Group VP, U.S. Eastern Ops. (2005-07) Group Executive, Appalachian Ops. (2001-05) |
| Michael V. Altrudo (SVP) | Advisor, COALTRADE Int'l (2005-07) President, COALTERADE Int'l (2004-05) |
| Joseph W. Bean (SVP, GC & Sec'y) | VP & Associ. Gen'l Counsel (2005-07) Senior Counsel (2001-05) |
| Charles Ebetino (SVP) | Senior VP (2006-07) Senior VP for COALSALES (2003-06) |
| Sara E. Wade (SVP) | VP (2006-07) Director of Compensation & Employee Relations (2004-06) |

Patriot Coal "Spin-Off Roadshow" Powerpoint Presentation (October 2007), a copy of which is attached hereto as Exhibit 37.

94.     In view of the realities of the transaction and the cyclical nature of the price of coal, it was inevitable that Patriot would eventually fail under the weight of its retiree healthcare and other legacy obligations.  Patriot, saddled with liabilities that very nearly equaled its assets, reported a net loss to stockholders of $122,535,000 in its annual report for 2007.  Exhibit 30, at 39. Despite reporting gains starting in the second quarter of 2008, Patriot began reporting losses to its stockholders in the second quarter of 2010. Patriot Coal Corp., Quarterly Report (Form 10-Q), at 1 (Aug. 6, 2010), attached hereto as Exhibit 39.

95.     Peabody knowingly spun-off Patriot with an unreasonably small capital base. Prior to the spin-off, the Peabody subsidiaries that were spun-off into Patriot suffered from both a lack of liquidity and low cash capital, issues that unsurprisingly continued to be a problem for the subsidiaries after they were spun off into Patriot.

96.     Peabody subsidiaries that were spun-off into Patriot operated at a negative cash flow level for 2005 through 2007, when supporting contributions from Peabody are excluded. These subsidiaries received approximately $44 million per year of cash contributions from Peabody in 2006 and 2007, in order to bring them near to a breakeven cash flow level. In 2005, the Peabody subsidiaries that were spun-off into Patriot generated negative cash flow, before financing, in the amount of $11,706,000. In 2006, the Peabody subsidiaries that were spun-off into Patriot again generated negative cash flow, before financing, in the amount of $18,748,000. Peabody contributed $44,538,000 to these subsidiaries, so in total, for 2006, the subsidiaries that

36

were spun-off to Patriot generated $121,000 in cash flow.  Once again, in 2007 the Peabody

subsidiaries that were spun-off into Patriot generated negative cash flow, before financing, in the

amount of $24,978,000 and Peabody contributed $43,647,000. In total, for 2007, cash flow for

the Peabody subsidiaries that were spun-off to Patriot was $5,585,000. At the time of the spin-

off, Patriot only had $5,983,000 in cash and cash equivalents.  Exhibit 30, at Annex F-5.

97.     In its first quarter operating as a stand-alone entity, Patriot reported a working

capital deficit of $15 million and Patriot had to draw down $22.5 million on its credit facility to

fund its operating losses. Patriot repaid outstanding amounts under the credit facility in the 2nd

quarter of 2008 out of proceeds from a common stock offering, but the operations continued to

generate negative cash flow. Exhibit 30, at Annex F-5, F-19.

98.     The Peabody subsidiaries that formed Patriot did not historically generate a

sufficient level of profitability to sustain the liabilities incurred in the spin-off. Upon information

and belief, Patriot's target sustainable debt level at the time of the spin-off was approximately

$315 million. But Patriot's debt level at the time of the spin-off was nearly four times as high, as

it carried approximately $1.2 billion in debt. Therefore, Patriot was overleveraged by

approximately $886 million.

99.     The legacy liabilities that were spun-off onto Patriot by Peabody were known to

be unsustainable given the characteristics of the coal market. As stated by Mark Schroeder,

Patriot's former Senior Vice President and Chief Financial Officer, and Senior Vice President of

Financial Planning at the time of Patriot's bankruptcy filing:

> In recent years, the demand for coal has decreased, in large part because
> alternative sources of energy have become increasingly attractive to electricity
> generators in light of declining natural gas prices and more burdensome

> environmental and other governmental regulations.  At the same time, the
> Debtors' liabilities have been increasing as the Debtors face sharply rising
> costs to comply with such regulations and because of *unsustainable labor-
> related legacy liabilities.*

Declaration of Mark N. Schroeder, p. 8, ¶ 21, B.R. Case No. 12-12900-SCC, Docket No. 4,

July 9, 2012 (emphasis added), attached hereto as Exhibit 40.

100.    Peabody knew the spun-off company would be unable to generate cash flow and

obtain credit sufficient to meet its obligations as they became due.  The description of "risk

factors relating to the spinoff" included in Patriot's 10k filing for period ending  December 31,

2007 - which reported data primarily addressing the years prior to the spinoff and was certified

by Richard Whiting, a former Vice President and Chief Operating Officer with Peabody -

contained  prescient and specific admissions of Patriot's inability to survive as an independent

entity, including the following:

- The historical and pro forma financial information we have included in
  this report may not reflect what our results of operations, financial
  position and cash flows would have been had we been an independent
  company during the periods presented or be indicative of what our
  results of operations, financial position and cash flows may be in the
  future.

- We may need to incur debt on terms and at interest rates that may not
  be as favorable as those historically enjoyed by Peabody. In addition,
  future events may prevent us from borrowing funds under our revolving
  credit facility. Any inability by us to obtain financing in the future on
  favorable terms could have a negative effect on our results of
  operations, cash flows and financial condition.

- Our business may not generate sufficient cash flows from operations
  and future borrowings may not be available to us under our credit
  facility or otherwise in an amount sufficient to enable us to repay any
  borrowings under our credit facility or to fund our other liquidity needs.
  We may not be able to refinance the revolver under our credit facility
  on commercially reasonable terms, on terms acceptable to us or at all.

Exhibit 30, at 18, 25.

101.     Peabody was also aware that other outside factors would challenge Patriot's long-term sustainability. In addition to transferring significant retiree healthcare liabilities to Patriot, the mines spun-off to Patriot were also encumbered by asset-retirement obligations, including expenses related to selenium water treatment and reclamation of closed mining properties. Peabody was also aware that the passage of the Clean Water Act and its enforcement would result in higher treatment costs, for both itself and Patriot.

### C.  The Purchase of Magnum by Patriot

102.     Prior to Peabody's spin-off of Patriot, officials of Peabody conducted a series of meetings with officials of Magnum to consider the possibility of a merger or acquisition of Magnum by Peabody.  Peabody did not acquire Magnum.

103.     Instead, on April 2, 2008, Patriot announced that it signed an agreement to acquire Magnum at a price of $709 million. Magnum stockholders were to receive 11.9 million shares of newly-issued Patriot common stock. Patriot Coal Corp., Current Report (Form 8-K), at 1 (April 2, 2008), attached hereto as Exhibit 31.

104.     The acquisition became effective on July 23, 2008. As a result, ArcLight owned approximately 17% of Patriot shares and Magnum's other stockholders owned a combined 15% interest in Patriot. Part of the merger deal required Patriot to assume $150 million of Magnum Coal Company's debt.  Exhibit 41; Exhibit 35.

105.    Patriot's acquisition of Magnum caused a massive increase in Patriot's reported OPEB obligations, which were valued at $555 million at the end of 2007 and increased to $1,065 million at the close of 2008 – a 92% increase. Exhibit 35, at  F-32.

106.    In response to a question regarding Patriot's taking on Magnum's legacy liabilities, Rick Navarre of Patriot stated:

> They [Magnum] do have legacy liabilities, like Patriot has legacy liabilities. We're very familiar with how to work with those, how to control those costs. We are not afraid of legacy liabilities, and yes they do. I think their number is in the $500 million range.

Patriot Coal Co., Conference Call (April 3, 2008). A true and accurate copy of the relevant portions of the transcript of this conference call is attached as Exhibit 42.

**D.    Patriot's Legacy Liabilities**

107.    Upon information and belief, Patriot is obligated to provide postemployment healthcare benefits for the following approximate numbers of UMWA represented employees, former employees, and their dependents, associated with former Arch and Magnum subsidiaries: over 400 active employees, almost 200 employees whose employment terminated but whose right to benefits had vested, and over 2100 retirees, disabled former employees, surviving spouses and dependent children.  The estimated value of the postretirement benefit obligations for UMWA represented employees covered by Patriot who are associated with former Magnum subsidiaries exceeds $500 million.

108.    Upon information and belief, over 90% of the beneficiaries associated with former Arch subsidiaries who now receive postretirement benefits from Patriot never worked for Patriot, but were former employees, or dependents of employees, of Arch or its subsidiaries.

40

109.    Upon information and belief, Patriot is obligated to provide postemployment healthcare benefits for the following approximate numbers of employees, former employees, and their dependents, associated with former Peabody subsidiaries: over 1000 active employees, over 500 employees whose employment terminated but whose right to benefits had vested, and over 2400 retirees, disabled former employees, surviving spouses and dependent children. The estimated value of the postretirement benefit obligations for UMWA represented employees covered by Patriot who are associated with former Peabody subsidiaries exceeds $900 million.

110.    Upon information and belief, over 90% of the beneficiaries associated with former Peabody subsidiaries who now receive postretirement benefits from Patriot never worked for Patriot, but were former employees, or dependents of former employees, of Peabody or its subsidiaries.

**E.    Patriot's Declaration of Bankruptcy and Subsequent Demands on Peabody and Arch**

111.    Patriot and substantially all of its wholly-owned subsidiaries filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the US Code in the Bankruptcy Court for the Southern District of New York on July 9, 2012.

112.    Patriot's former Senior Vice President and Chief Financial Officer, Mark Schroeder, described the events leading to the Chapter 11 filings in his July 9, 2012 Declaration to the Bankruptcy Court. Schroeder stated:

> In recent years, the demand for coal has decreased, in large part because alternative sources of energy have become increasingly attractive to electricity generators in light of declining natural gas prices and more burdensome environmental and other governmental regulations. At the same time, the Debtors' liabilities have been increasing as the Debtors face sharply rising

41

costs to comply with such regulations and because of ***unsustainable labor-related legacy liabilities***. (Emphasis added).

Exhibit 40, at p. 8, ¶ 21.

113.    Schroeder elaborated on the effect of assuming Arch's and Peabody's legacy liabilities and Patriot's inability to maintain the current level of benefits, as he explained:

> The Debtors have substantial and unsustainable legacy costs, primarily in the form of medical benefits and pension obligations. Among other things, as a result of the spin-off from Peabody and the acquisition of Magnum, the Debtors assumed certain liabilities relating to former employees and retirees of Peabody and Arch who retired prior to the formation of Patriot. Indeed, the Debtors currently provide benefits to more than three times the number of retirees and non-active employees and those parties' dependents than to active employees. Especially in an era of declining demand and price for coal, there is a mismatch between the cost of the Debtors' legacy obligations and their ongoing ability to generate revenue. The Debtors' return to long-term viability depends on their ability to achieve savings with respect to these liabilities.

Exhibit 40, at p. 11, ¶ 33.

114.    Further demonstrating that Patriot intends to cut its retiree healthcare and pension obligations through its Chapter 11 filing, Irl Engelhardt, Chairman and Chief Executive Officer of Patriot, wrote to Senator Joe Manchin, on October 19, 2012, stating

> Patriot's financial burdens, the weak coal markets and various uncompetitive contracts prevent us from generating the financial resources to provide the same level of healthcare and pension benefits for retirees if we are to emerge from the Chapter 11 proceedings. . . . The alternative is liquidating Patriot's assets.

A true and correct copy of this letter is attached as Exhibit 43.

115.    Given Patriot's clear indication that it sought to "achieve savings with respect to these [medical and pension] liabilities," Cecil E. Roberts, President of the UMWA, on behalf of the UMWA members affected by the bankruptcy filing, demanded that Arch and Peabody stand

42

by their promises to provide "cradle to grave health care" for bargaining unit employees. In October 15, 2012 letters sent to Gregory Boyce, Chairman and CEO of Peabody Energy, and John Eaves, President and CEO of Arch, President Roberts stated the Union believed Arch and Peabody "remain[ed] responsible for providing to its retirees all of the post-employment benefits [Arch and Peabody] promised when those individuals worked for [Arch and Peabody]." Copies of these letters are attached hereto as Exhibit 44 and Exhibit 45.

116.    Peabody responded to President Roberts's letter through its attorneys on October 25, 2012. Peabody indicated that any response would be inappropriate at that time. A copy of this letter is attached hereto as Exhibit 46.

117.    As a result, Grant Crandall, General Counsel for the UMWA, wrote a letter to Peabody urging it to reconsider its response and to provide a substantive answer to the UMWA's request that Peabody take responsibility for the costs associated with its retirees. Crandall wrote "please consider this a request that Peabody reconsider its refusal to provide the benefits that it promised to its retirees and their families." A copy of this letter is attached hereto as Exhibit 47.

118.    Peabody replied to Crandall on November 6, 2012, again refusing to make a substantive response to the UMWA's request that Peabody take responsibility for its retiree healthcare costs. The letter states that Peabody's "responses must be made in the litigation context." A copy of this letter is attached hereto as Exhibit 48.

119.    To date, Arch has not made any response to UMWA President Roberts's October 15, 2012 letter requesting it take responsibility for providing post-employment benefits to former

employees of Arch who are now employed by Patriot or whose benefits are maintained by Patriot.

120.    On November 15, 2012, representatives of Patriot met with representatives of the UMWA in Charleston, West Virginia.  At this meeting, Patriot presented the UMWA with a proposal for modification of the current collective bargaining agreements pursuant to Section 1113 of the Bankruptcy Code (the "1113 Proposal") and a proposal for modification of its non-Coal Act UMWA retiree healthcare obligations under Section 1114 of the Bankruptcy Code (the "1114 Proposal").

121.    Patriot's 1113 Proposal seeks to delete Article XX in its entirety in each of its collective bargaining agreements that contained Article XX, which would eliminate the obligation to provide retiree health benefits to any former, current or future employee. Patriot's 1114 Proposal proposes that Patriot and its 99 subsidiaries in bankruptcy shall have no liabilities with respect to the UMWA Retirees. As an alternative to its contractual healthcare provisions, Patriot has proposed to establish a Voluntary Employees' Beneficiary Association ("VEBA"), to provide health care to the covered retirees and their dependents. Patriot has proposed to fund the VEBA with a financial commitment of $15 million dollars paid on June 1, 2013, as well as the proceeds of a profit-sharing mechanism equal to 15% of net income (exclusive of exceptions) and capped at $40 million annually and $200 million in the aggregate. In addition, Patriot proposes that a distribution in the form of an unsecured claim against Patriot's estate in an amount yet to be determined could be used to fund the VEBA. Patriot has calculated the current cost of providing retiree health care to non-Coal Act retirees and their dependents to be $71

44

million for 2012, which increases to approximately $73.8 Million in 2013. Patriot has proposed that the funding of the VEBA will be its exclusive contribution to the funding of the retiree healthcare benefits.

122.   Patriot has also proposed that its 1113 and 1114 Proposals, including the deletion of the obligations contained in Article XX and the elimination of retiree healthcare benefits, would take effect June 1, 2013.

123.   As of the date of the filing of this Amended Complaint, Patriot has not withdrawn its Section 1113 Proposal or Section 1114 Proposal. The Section 1114 Proposal was modified to reflect the terms described, above, on January 17, 2013.

124.   Upon information and belief, based upon communications with Patriot management, Peabody has taken the position that if Patriot obtains relief under Section 1114 of the Bankruptcy Code, Peabody will no longer be responsible for reimbursing Patriot for retiree healthcare obligations pursuant to a "poison pill" provision in the NBCWA Liability Assumption Agreement. It is apparently Peabody's position that relief under Section 1114 would trigger a provision of the Assumption Agreement relieving its obligation to reimburse Patriot for any benefits greater than the level of benefits provided to retirees by Patriot who were previously associated with Peabody's former subsidiary, Eastern Associated Coal. Thus Peabody believes it positioned itself during the spin-off so that when Patriot would inevitably fall under the weight of its legacy obligations, Peabody could become a derivative beneficiary of Patriot's demise. Patriot's obligation to provide benefits for the Eastern Associated Coal retirees would cease (or at least be lessened) as a result of a bankruptcy filing and modification or rejection of the

collective bargaining agreement, and so too, Peabody asserts it would be off-the-hook for providing reimbursement to Patriot for any of the retirees under the NBCWA Liability Assumption Agreement.

125.    Through the bankruptcy proceeding, Patriot provided the UMWA with lists of retirees whose medical benefit payments are made by Peabody pursuant to the Coal Act Liabilities Assumption Agreement and the NBCWA Liability Assumption Agreement. Upon review of these lists, the UMWA determined that Peabody is not reimbursing Patriot or otherwise providing payment for the cost of medical benefits for over 500 retirees who satisfy the descriptions of the categories of retiree for whom Peabody owes payment or reimbursement. This includes approximately 450 retirees described in the NBCWA Liabilities Assumption Agreement and approximately 50 retirees described in the Coal Act Liabilities Assumption Agreement. Included within these 500 retirees are approximately 100 retirees whose health care costs Peabody paid or reimbursed Patriot for a period of approximately one year after the spin-off. Because the UMWA was only provided access to these lists in November 2012, neither the UMWA nor the retirees could determine which retirees were at risk for losing their benefits as a result of the Peabody spin-off of Patriot.

**VI.    EXHAUSTION IS NOT REQUIRED**

126.    Exhaustion of administrative remedies is not required as this claim is of a statutory violation of ERISA.

127.    Even if exhaustion is required, exhaustion is futile because the Plans at issue, which are now maintained by Patriot, do not have the authority to bind Defendants to provide the

relief sought such that they would be in a position to make a binding determination in relation to the Defendants. None of the Plaintiffs' claims would be advanced if they were submitted to an administrative entity of the Plan.

128.    Any effort to exhaust administrative remedies would also be futile because the Defendants do not have an administrative procedure or remedy for reviewing the claims asserted herein, as evidenced by the Defendants' failure and refusal to substantively respond to the Union's October 15, 2012 requests.

129.    Alternatively, the Plaintiffs have exhausted their administrative remedies by virtue of the Union's written demands.

**VII.    CLASS ACTION ALLEGATION**

130.    Class Representatives bring this class action on behalf of themselves and a class of similarly situated former employees of Peabody or Arch and/or their subsidiaries consisting of: (1) retirees of Peabody and/or Patriot who previously worked at Peabody and/or its subsidiaries; (2) retirees of Arch and/or Patriot who previously worked at Arch and/or its subsidiaries; (3) current employees of Patriot who previously worked for Peabody and/or its subsidiaries; (4) current employees of Patriot who previously worked for Arch and/or its subsidiaries; and (5) retirees of Peabody and/or its subsidiaries whose benefits were supposed to be continued to be covered by Peabody following the spin-off pursuant to the NBCWA Liability Assumption Agreement and the Coal Act Liabilities Assumption Agreement, but who have been covered by Patriot.

47

131.    While the exact number of Class Members is not presently known, on information and belief, it exceeds 10,000. As such, it is so numerous that joinder of individual members in this action is impracticable.

132.    Class Members seek to require Defendants to fulfill their commitments to provide retiree benefits at their current levels, as required under the collectively bargained for Benefits Plans.

133.    There are common questions of law and fact that relate to and affect Class Members – namely, whether Defendants purposely interfered with the attainment of retiree benefits as set forth in more detail below in Counts I and II of this Complaint.

134.    The relief sought is common to all Class Members as set forth below in the section entitled "Prayer for Relief."

135.    The claims of Class Representatives are typical of the claims of all Class Members, namely that Defendants purposely interfered with the attainment of retiree benefits in violation of Section 510 and Section 502(a)(3) of ERISA.  There is no conflict between Class Representatives and any other Class Member with respect to this action.

136.    The Class Representatives will fairly and adequately protect the interests of the Class Members. Attorneys for the Class Representatives are experienced and capable in the field of labor law and ERISA.

137.    This action is properly maintained as a class action under Federal Rule of Civil Procedure 23(b)(2), in that Defendants have discharged and discriminated against Class Members with the specific intent of interfering with the attainment of benefits under the Benefits

Plans, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the class as a whole.

138.     Alternatively, this action is maintainable as a class action under FRCP Rule 23(b)(3), as the common questions of law and fact described above predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

139.     Alternatively, this action is maintainable as a class action under FRCP Rule 23(b)(1).  Because of the uniform standards of conduct imposed by ERISA, the prosecution of separate actions by individual members of the class would create a risk of:  (i) inconsistent adjudications that would establish incompatible standards of conduct for Defendants, and (ii) adjudications that would be dispositive of the interests of non-party class members or substantially impair such non-party class members' ability to protect their interests.

## COUNT I
### (For Declaratory Relief)

140.     Plaintiffs' incorporate the allegations contained in paragraphs 1 to 139 of this Complaint, as though fully set forth here.

141.     There is an actual actionable and justiciable controversy that exists between the parties which the Court can resolve with finality by declaring the rights of the parties.

142.     It is in the public interest to have the rights of the parties determined because the declaratory judgment will afford relief from uncertainty, insecurity, and controversy giving rise to this proceeding, in as much as Defendants claim they are not responsible for maintaining the benefit plans spun-off or sold to Patriot.

49

143.    Based upon the representations made to Plaintiffs by Defendants regarding the continued payment of their benefits, Plaintiffs are entitled to continue receiving these benefits and for these benefits to be funded by the Defendants.

144.    Pursuant to 28 U.S.C. § 2201, Plaintiff seeks a declaratory judgment that Defendants are obligated to maintain funding of the benefit plans at issue.

**COUNT II**
(For Injunctive Relief)

145.    Plaintiffs' incorporate the allegations contained in paragraphs 1 to 144 of this Complaint, as though fully set forth here.

146.    ERISA Section 510, 29 U.S.C. § 1140, makes it unlawful to "discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . ., or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . ."

147.    Plaintiffs were discriminated against by Defendants for exercising their rights under the provisions of their applicable employee benefit plans and were discriminated against with the specific intent of interfering with the attainment and/or enjoyment of benefits under the plans.  Defendants conceived and implemented corporate schemes to spin-off or sell their largest liabilities, including retiree, pension, and health and welfare benefits, into new corporations, Patriot and Magnum, which would inevitably fail.

148.     Plaintiff employees of Peabody and Arch subsidiaries as of the date of their spin-off or sale, respectively, suffered a discharge even though they did not become unemployed as a result of the Defendants' schemes to separate themselves from their liabilities.

149.     Plaintiff retirees of Peabody and Arch subsidiaries suffered discrimination as the Defendants spun-off or otherwise disposed of their obligations to pay retiree benefits with the purpose of interfering with the exercise of these rights under the benefit plans.

150.     Peabody's desire to defeat its liabilities for payment of retiree and other benefits was a determinative factor in its unlawful corporate reorganization scheme that led to the Patriot spin-off.  Peabody planned to transfer its employees and benefit plan obligations to Patriot for the purpose of depriving its employees and retired employees of and interfering with the use and enjoyment of their welfare and retiree benefits.

151.     Arch's desire to defeat its liabilities for payment of retiree health and other benefits was a determinative factor in the unlawful corporate reorganization scheme that led to the sale of assets to Magnum.  Arch planned to transfer its employees and benefit plan obligations to Magnum for the purpose of depriving its employees and retired employees of and interfering with the use and enjoyment of their welfare and retiree benefits.

152.     Patriot, saddled with such liabilities, did fail and declared bankruptcy on July 9, 2012.

153.     In its bankruptcy filings, Patriot has indicated that a principal reason for its insolvency is its retiree health obligations.

154.    Patriot has confirmed that the continuation of healthcare benefits to retirees is an issue that needs to be addressed through modification or potential rejection of the collective bargaining agreement between Patriot and the UMWA in its 1113 and 1114 Proposals

155.    Although the spin-off of Patriot became effective October 3, 2007 and Arch sold its assets to Magnum on December 31, 2005, the injury to Peabody and Arch's former employees did not become apparent until the bankruptcy proceedings in 2012 – the completion of Defendants' unlawful schemes – when Patriot proclaimed its intention to reduce healthcare costs and benefits and when the UMWA was provided a list of the retirees for which Patriot was responsible for providing benefits, which included former Arch and Peabody employees. Consequently, Plaintiffs could not have discovered their injury until at least July 9, 2012.

156.    Although Peabody and Arch are bound to commitments to provide lifetime health care to their respective former employees, their wrongful and discriminatory actions in spinning-off their unionized subsidiaries will result in the reduction or elimination of those promised benefits without injunctive relief. Prior to Patriot's bankruptcy filing, Plaintiffs had no imminent expectation of a curtailment of their continued receipt of benefits and their injury was speculative.

157.    Defendants' conduct, as set forth in this Count, violates Section 510 of ERISA, 29 U.S.C. § 1140.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the following relief on behalf of themselves and the Plaintiff Class:

A.      That the Court enter judgment against Defendants declaring that Defendants are obligated to maintain funding of the Plaintiffs' benefit plans;

B.      That the Court enter judgment against Defendants declaring that the practices complained of herein are a violation of Section 510 of ERISA, 29 U.S.C. § 1140, pursuant to ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3);

C.      That the Court enter judgment enjoining Defendants to maintain the benefit plans at their current levels of funding;

D.      That the Court award such other equitable or remedial relief, pursuant to ERISA §502(a)(3), 29 U.S.C. § 1132(a)(3), including equitable restitution and equitable monetary relief against the Defendants;

E.      That the Court award Plaintiffs their attorneys' fees, costs, and expenses of this litigation; and

F.      That the Court award any other relief, under ERISA or under federal common law, as the Court deems equitable and proper.

53

Respectfully Submitted,


_____/s/ Bradley J. Pyles_____          _____/s/ John R. Mooney_____
Bradley J. Pyles, Esq.                  John R. Mooney, Esq. (admitted *pro hac vice*)
WV Bar No. 2998                         Mark J. Murphy, Esq. (admitted *pro hac vice*)
Pyles Law Firm, PLLC                    Mooney, Green, Saindon, Murphy &
P.O. Box 596                               Welch, P.C.
Logan, West Virginia  25601             1920 L Street, N.W., Suite 400
(304) 752-6000                          Washington, DC  20036
                                        (202) 783-0010


_____/s/ Charles F. Donnelly_____       _____/s/ Grant Crandall_____
Charles F. Donnelly, Esq.               Grant Crandall, General Counsel
WV Bar No. 1039                         WV Bar No. 861
Senior Staff Attorney                   Arthur Traynor, Staff Attorney
United Mine Workers of America          United Mine Workers of America
1300 Kanawha Blvd, East                 18354 Quantico Gateway Drive, Ste. 200
Charleston, West Virginia 25301         Triangle, VA 22172
(304) 346-0341                          (703) 291-2400


Counsel for Plaintiffs

54

## CERTIFICATE OF SERVICE

I, Bradley J. Pyles, do hereby certify that on January 30, 2013, I have filed a true and correct copy of the of the Plaintiffs' Second Amended Complaint in the ECF system, by electronic delivery to the ECF system, which will send notification of filing of the above pleading to the following parties:

 Forrest H. Roles (WV State Bar #3162)
Anna M. Dailey (WV State Bar #4525)
Dinsmore & Shohl LLP
P.O. Box 11887
900 Lee Street, East, Suite 600 Charleston, WV 25339-1887
Counsel for Arch Coal, Inc.

Jeffrey S. Russell
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO 63102-2750 Counsel for Arch Coal, Inc.

Michael Bonasso (WV State Bar #394)
Thomas V. Flaherty (WV State Bar #1213)
Tammy R. Harvey (WV State Bar #6904)
Flaherty Sensabaugh Bonasso PLLC
P.O. Box 3843
Charleston, WV 25338-3843
Telephone (304) 344-4259
Facsimile (304) 345-0260

Evan Miller
Sara Rachel Pikofsky
Shay Dvoretzky
Admitted Pro Hac Vice
Jones Day
51 Louisiana Avenue, NW
Washington, DC 20001-2113

_____/s/ Bradley J. Pyles_____
Bradley J. Pyles, Esquire Pyles Law Firm
P.O. Box 596 Logan, WV 25601
Phone 304-752-6000 Fax 304-752-2050