IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

HUBERT LOWE, et al.,

        Plaintiffs,

v.                                   CIVIL ACTION NO. 2:12-cv-06925

PEABODY HOLDING COMPANY, LLC, et al.,

        Defendants.

**ORDER**

Pending before the court are defendants Peabody Holding Company, LLC[1] and Peabody Energy Corporation's (collectively "Peabody") motions to dismiss the complaint [Dockets 28, 29], Peabody's motions to dismiss the plaintiffs' second amended complaint [Dockets 45, 46], Peabody's Motion for Leave to Supplement the Record in Defense of their Motion to Dismiss [Docket 56], defendant Arch Coal, Inc.'s ("Arch") Motion to Dismiss Plaintiffs' Complaint [Docket 26], and Arch's Motion to Dismiss Amended Complaint [Docket 41].

On January 28, 2013, the plaintiffs filed an Amended Complaint [Docket 36] and on January 30, 2013, they filed a Second Amended Complaint [Docket 39]. The motions have been fully briefed and are now ripe for review. As set forth below, the defendants' subsequent motions to dismiss [Dockets 41, 45, 46] are **GRANTED**. The defendants motions to dismiss the original complaint [Dockets 26, 28, 29] and Peabody's Motion for Leave to Supplement the Record in Defense of their Motion to Dismiss [Docket 56] are **DENIED as moot**.

---

1 Peabody Holding Company, LLC ("Peabody Holding") is a subsidiary of Peabody Energy Corporation ("Peabody Energy"). (*See* Second Am. Compl. [Docket 39], ¶ 18).

## I. Background

The plaintiffs represent a class of mine workers formerly employed by Arch and Peabody subsidiaries, as well as the labor organization United Mine Workers of America ("UMWA"), which represented the individual plaintiffs employed by Arch and Peabody subsidiaries. (*See* Second Am. Compl. [Docket 39], ¶¶ 6-17). Each of the plaintiffs is entitled to lifetime benefits pursuant to the National Bituminous Coal Wage Agreements ("NBCWAs") and other related agreements. (*Id.* ¶¶ 30, 45). The subsidiaries of Arch and Peabody that employed the plaintiffs were signatories to the NBCWAs and are liable for the plaintiffs' benefits pursuant to them. (*Id.* ¶ 31).

On August 9, 2005, Arch and ArcLight Capital Partners LLC ("ArcLight") indicated their intent to create a new company called Magnum Coal Company ("Magnum"). (*Id.* ¶ 54). Magnum was created on October 5, 2005. (*Id.*) On December 31, 2005, Arch sold the entirety of its stock in its subsidiaries, Hobet Mining, Apogee Coal Company, and Catenary Coal Company, to Magnum for $15 million. (*Id.* ¶ 56). As part of this transaction, Magnum assumed Arch's benefits liability in the sold subsidiaries. (*Id.*) All miners covered by NBCWAs were transferred from Arch to Magnum in this sale. (*Id.* ¶ 57). An Arch press release indicated that the reduction in benefits liability was a motivator for the sale of the subsidiaries. (*Id.* ¶ 64).

On October 31, 2007, Patriot Coal Corporation ("Patriot") was spun-off from Peabody Energy. (*Id.* ¶¶ 81-82). After the spin-off, Patriot became an independent, public entity. (*Id.* ¶ 82). During this transition, Peabody Energy transferred several assets to Patriot. (*Id.* ¶ 84). These assets included ownership interests in eleven Peabody Energy subsidiaries, each of which were current or past signatories to the NBCWAs. (*Id.*) A stated motivator in the sale of these

subsidiaries to Patriot was the subsequent reduction in retiree healthcare liability. (*Id.* ¶ 90). In addition, while Peabody Energy was contemplating the spin-off, Peabody Holding agreed to be primarily obligated to pay the benefits of a certain number of Heritage retirees. (Section 9711 Coal Act Liabilities Assumption Agreement Ex. 33 [Docket 39-33], at 1). Heritage was one of the subsidiaries that was transferred to Patriot during the spin-off. (Second Am. Compl. [Docket 39], ¶ 84).

On April 2, 2008, Patriot acquired Magnum and its associated benefits liabilities. (*Id.* ¶¶ 103-05). Patriot, therefore, became obligated to pay the lifetime healthcare benefits of all of the former Arch and Peabody subsidiary employees who are plaintiffs in this suit. (*Id.* ¶ 107). Finally, on July 9, 2012, Patriot and substantially all of its subsidiaries, including those who employ the plaintiffs, filed for Chapter 11 bankruptcy. (*Id.* ¶ 111). In Patriot's bankruptcy filings and related documents it indicated its attempt to remove or lessen its financial burden due to owed healthcare benefits. (*Id.* ¶¶ 112-14).

In May 2013, the United States Bankruptcy Court for the Eastern District of Missouri ruled that Patriot could terminate its existing collective bargaining agreements with the UMWA and modify its obligations to provide healthcare to its retirees. (Joint Status Report [Docket 83], at 4). The court also ruled that Peabody Holding could discontinue the healthcare benefit obligations it had agreed to assume. (*Id.*)

On June 30, 2013, Patriot and the UMWA entered into a new collective bargaining agreement, which allows Patriot to transfer retiree healthcare to a Voluntary Employee Benefit Association ("VEBA"). (*Id.* at 6). The VEBA will be funded by a 35-38 percent equity interest in post-bankruptcy Patriot, "a cash contribution, limited royalty payments, and profit sharing contributions." (*Id.* at 4). According to the plaintiffs, these funding sources are insufficient to

3

provide "uninterrupted benefits for the affected population of retirees." (*Id.* at 5). Absent relief by this court, the plaintiffs claim that the affected employees will experience either a diminution or a complete loss of their benefits. (*Id.*)

On August 22, 2013, the United States Bankruptcy Appellate Panel for the Eighth Circuit (the "BAP") reversed the bankruptcy court's decision, holding that Peabody Holding is still liable to pay its assumed retiree healthcare obligations. (*Id.* at 4). The BAP did not comment on how a new collective bargaining agreement would affect Peabody Holding's liability to pay the assumed retiree benefits. (*Id.* at 5). The parties disagree on how the above-described events affect the defendants' liability in this action. (*See generally* Joint Status Report [Docket 83]).

The plaintiffs pray for a declaratory judgment stating that Arch and Peabody's decisions to sell their subsidiaries were violations of § 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. The plaintiffs seek injunctive relief requiring the defendants to maintain the plaintiffs' benefit plans. (Second Am. Compl. [Docket 39], at 53). In the instant motions, Peabody and Arch move to dismiss the plaintiffs' claims against them. Peabody and Arch seek dismissal under Fed. R. Civ. P. 12(b)(6) by asserting that the statute of limitations has expired and that the plaintiffs failed to state a claim under § 510 of ERISA. Peabody additionally seeks dismissal or a stay under Fed. R. Civ. P. 19 because Patriot is a necessary and indispensable party to the suit whose inability to join the suit is fatal to the action.

### II.  Legal Standard

#### A. Motion to Dismiss

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Federal Rule of Civil Procedure 8 requires that a pleading contain a "short and plain statement of the claim showing

4

that the pleader is entitled to relief." Fed. R. Civ. P. 8. As the Supreme Court recently reiterated in *Ashcroft v. Iqbal*, that standard "does not require 'detailed factual allegations' but 'it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) for the proposition that "on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'"). A court cannot accept as true legal conclusions in a complaint that merely recite the elements of a cause of action supported by conclusory statements. *Iqbal*, 556 U.S. at 678-79. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). To achieve facial plausibility, the plaintiff must plead facts that allow the court to draw the reasonable inference that the defendant is liable, and those facts must be more than merely consistent with the defendant's liability to raise the claim from merely possible to probable. *Id.*

In determining whether a plausible claim exists, the court must undertake a context-specific inquiry, "[b]ut where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). A complaint must contain enough facts to "nudge[] [a] claim cross the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### B. ERISA

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983). The Act was passed to "remedy certain defects in the private retirement system which limit the effectiveness of the system in providing retirement income security." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 236 (4th Cir. 1991) (quoting H.R. Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4639). To add "teeth" to this remedial scheme, Congress passed enforcement provisions "to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act." *Id.* (quoting H.R. Rep. No. 533, 93d Cong., 1st Sess. (1973), *reprinted in* 1974 U.S. Code Cong. & Admin. News 4639, 4655).

One such provision is § 510 of the Act, which provides that

> [i]t shall be unlawful for any person to discharge . . . a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act. . . . The provisions of section 1132 of this title [civil enforcement] shall be applicable in the enforcement of this section.

29 U.S.C. § 1140. A plain reading of this statute indicates that an employer may not interfere with the attainment of any right to which employees may become entitled to under ERISA or a covered benefit plan.

In order for a claim to stand pursuant to § 510 of ERISA, the plaintiff must demonstrate that there was: "(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled." *Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir. 1996) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037,

6

1043 (6th Cir. 1992)); *see also Stiltner v. Beretta U.S.A. Corp.*, 74 F.3d 1473, 1482 (4th Cir. 1996). This interference with benefits need not be the only reason for the conduct, but must be a "motivating factor." *Humphreys*, 966 F.2d at 1043. Furthermore, the phrase "'[t]aken for the purpose of interfering' does require evidence of a [causal] connection between the prohibited conduct and attainment of the benefit. Courts have held that temporal proximity can satisfy plaintiff's burden." Paul H. Tobias, 1 Lit. Wrong. Discharge Claims § 2:92 (2008); *cf.*, *Hamilton v. Starcom Mediavest Group, Inc.*, 522 F.3d 623, 629 (6th Cir. 2008) (holding that nine-month gap between adverse employment action and denial of benefits was not sufficient to establish causal connection).

### III. Analysis

This case turns on whether § 510 applies to "prohibited employer conduct" that affects a plan's capacity to pay benefits. Before addressing this issue, I note that organizational decisions that interfere directly with an employee's eligibility for benefits can implicate § 510.[2] However, I do not conclude that § 510 applies when these decisions only affect a plan's capacity to pay benefits. Section 510 protects the individual rights of employees to attain benefits, not the financial security of the plan as a whole. *Blaw Knox Ret. Income Plan v. White Consol. Indus., Inc.*, 998 F.2d 1185, 1191 (1993). Moreover, it would be infeasible to adopt the plaintiffs'

---

2 According to the plaintiffs' recitation of the facts, none of the plaintiffs were at any time direct employees of either Arch or Peabody; rather, they were employees of various subsidiaries in which Arch or Peabody held stock. The plaintiffs allege the "prohibited conduct" resulted from the defendants' decisions as holders of stock in these subsidiary companies. The Peabody plaintiffs point to the spin-off of subsidiaries to Patriot, and the Arch plaintiffs point to the sale of subsidiaries to Magnum as the conduct which was either a functional "discharge" or "discriminatory" under ERISA § 510. Despite this claim, after the spin-off and sale, respectively, each plaintiff was still an employee of the same company as before in the same role. However, as the plaintiffs point out, two cases have recognized that a § 510 claim might survive a motion for summary judgment despite the action taken being on the institutional rather than individual level. *See Andes v. Ford Motor Co.*, 70 F.3d 1332, 1338 (D.C. Cir. 1995) (Section 510 could possibly be implicated in an "organizational decision"); *see also Naumann v. Abbott Labs.*, 669 F.3d 854, 857 (7th Cir. 2012).

interpretation of the statute because it would render other provisions of ERISA superfluous. For the reasons discussed below, the defendants' subsequent motions to dismiss are **GRANTED**.

### A. Section 510 of ERISA Does Not Contain Protections Against Transactions Which Impact the Financial Security of Welfare Benefit Plans

The plaintiffs allege that, by selling or spinning off their subsidiaries, the defendants interfered with the employees' attainment of their pension rights. The plaintiffs contend that § 510 covers the "continuing right to *receive* benefits under the plan." (Pls.' Opp'n to Def. Arch Coal Inc.'s Mot. to Dismiss the Pls.' Am. Compl. [Docket 49], at 11(emphasis in original)). The plaintiffs argue their reading comports with Congress' intent to provide broad remedies under the statute. According to the plaintiffs, reading the statute differently would allow an employer to "lawfully" interfere with an employee's right to benefits by waiting until the right has vested and then transferring the obligation to an underfunded company. The defendants argue that they have not interfered with the employees' attainment of benefits because the employees' eligibility for benefits remained the same before and after the sale/spin-off of the subsidiaries. The defendants assert that under the plaintiffs' construction any company decision could be suspect under § 510.

As many courts have noted, the primary purpose "of § 510 is to prevent[ ] unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Conkwright*, 933 F.2d at 237 (quoting *West v. Butler*, 621 F.2d 240, 245 (6th Cir. 1980)). A classic example of this prohibited conduct is where an employer fires an employee before she can meet the conditions to qualify for retirement benefits. *See, e.g.*, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 144 (1990) (describing a claim that an employee was terminated four months before his pension vested, apparently to avoid making

8

contributions to the employee's pension, as "prototypical of [the kind of scenario] Congress intended to cover under § 510").

However, recognizing that § 510 is a "broad remedial" provision, some courts have extended the application of § 510 beyond this context. *See, e.g.*, *Conkwright*, 933 F.2d at 237 ("We have no reason to constrict this 'broad remedial' provision to only vested rights when the Act clearly contemplates suits to protect any rights implicated by employer action."). For example, the Fourth Circuit has held that § 510 not only protects the right to become a vested employee, but also protects the right to accrue additional vested benefits. *Id.* at 238. Courts adopting the Fourth Circuit's approach have explained that "Congress did not intend to leave employees unprotected once their rights vested . . . ." *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1222 (11th Cir. 1993). Similarly, courts have also found that organizational decisions that interfered directly with employees' ability to attain benefits might implicate § 510. *See Andes v. Ford Motor Co.*, 70 F.3d 1332, 1338 (D.C. Cir. 1995) ("If, for example, a plaintiff produced evidence that a particular company determined that 20 of its employees were *soon to become eligible* for a rich benefits package and noted that 19 of those employees were conveniently located in one subdivision . . . a company shutdown of that operation . . . merely masks a determination to interfere with the employee's *attainment of benefit plan rights*." (emphasis added)); *Naumann v. Abbott Labs.*, 669 F.3d 854, 857 (7th Cir. 2012) (Section 510 claim involving employees spun off to new entity that did not offer benefits made it to summary judgment stage, thus surviving motions to dismiss).

What these cases share in common is that the employer allegedly interfered with the employees' ability to *attain* a right or benefit, whether it was the right to become a vested employee or the right to additional vested benefits. Here, the plaintiffs do not assert that the spin-

9

off/sale of the subsidiaries interfered with their right to attain benefits. Instead, the plaintiffs argue their rights were interfered with because the sale/spin-off of the subsidiaries jeopardized the fund's capacity to pay their entitled benefits. However, courts have generally held that § 510 does not protect the financial stability of a pension fund. *Mattei v. Mattei*, 126 F.3d 794, 800 (6th Cir. 1997) ("[Section] 510 offers no protection against an employer's actions affecting the status or scope of an ERISA plan itself."); *West*, 621 F.2d at 246 ("[Section] 510 as we read it does not purport to protect the financial security of pension funds."). In fact, in an analogous case, where the plaintiffs claimed the defendant sold its subsidiaries to avoid liability for unfunded benefits, the court dismissed the claim because the sale "did not affect the participants' eligibility for benefits . . . ." *Blaw Knox*, 998 F.2d at 1118, 1191. "Although there was a change in employers," the court concluded "[i]t was only the plans' sponsorship that was altered while the participants' rights under the plans remained unchanged." *Id*. at 1191.

Similarly, the change in sponsorship of the fund does not interfere with the employees' ability to attain benefits. As the plaintiffs concede, employees were still entitled to the same welfare benefits after the transactions as before. Employees for multiple years continued to qualify and collect benefits and, according to the Complaint, they are still collecting now. Peabody subsidiary plaintiffs have been collecting and qualifying for five years since the spin-off to Patriot, and Arch plaintiffs have been collecting and qualifying for seven years since the sale to Magnum. While these transactions may affect the capacity of the fund to pay the benefits, this type of conduct is not within the ambit of § 510.

Even if § 510 provides a cause of action for decisions made which impact the financial security of ERISA plans, in addition to decisions which deny access to those plans, the causal connection between the decisions in this case and the impact on the plaintiffs is too attenuated.

Rather than being a decision made by an employer that impacts the employee in the immediate future, Peabody and Arch made decisions as shareholders of the companies employing the plaintiffs and these decisions did not impact the employees' access to their benefits until many years later. Therefore, I **FIND** that § 510 of ERISA does not contain protections against transactions that impact the financial security of welfare benefit plans.[3]

### B. Adopting the Plaintiffs' Construction of § 510 Would Render Other ERISA Provisions Superfluous

Despite the plaintiffs' claims, reading this cause of action into ERISA § 510 is not feasible. The Supreme Court has frequently stated "the canon [against surplusage] is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1178 (2013); *see also United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2330 (2011); *Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 837 (1988) ("[W]e are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law."). The Supreme Court has held that this canon is particularly strong when applied to ERISA due to "ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute.'" *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 141, 146 (1985) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361 (1980)). In *Mackey*, the Supreme Court held that an expansive reading of ERISA § 514(a) protecting both pension and welfare benefit plans from state attachment orders would render §

---

3 Today, I only hold that § 510 of ERISA is an inappropriate vehicle under which the plaintiffs can seek relief. After reviewing the plaintiffs' complaint, it appears the plaintiffs have alleged facts which suggest a cause of action under 26 U.S.C. § 9722 of the Coal Act. Under § 9722, "[i]f a principal purpose of any transaction is to evade or avoid liability under [the Coal Act], [the Coal Act] shall be applied (and such liability shall be imposed) without regard to such transaction." *See generally UMWA 1992 Ben. Plan v. Leckie Smokeless Coal Co.*, 201 B.R.163 (S.D. W. Va. 1996), *aff'd sub nom. In re Leckie Smokeless Coal Co.*, 99 F.3d 573 (4th Cir. 1996). However, the plaintiffs have not stated this claim.

206(d)(1) redundant as § 206(d)(1) protects *only pension benefits* from state attachment orders. 486 U.S. at 836-37. In *Russell*, the Court held that the specific protections of ERISA § 502(a) "provide strong evidence that Congress did *not* intend to authorize other remedies that it did not incorporate expressly." 473 U.S. at 146 (emphasis in original).

ERISA § 4069 states that employers who attempt to evade liability for *pension benefit plans* through the use of transactions or corporate reorganizations will remain liable for the benefits promised in those plans. *See* 29 U.S.C. § 1369. ERISA § 4212(c) provides that when, in multiemployer *pension benefit plans*, an individual attempts to evade or avoid liability for their obligation to contribute by means of a transaction, they will remain liable regardless of that transaction. *See* 29 U.S.C. 1392(c). ERISA § 510 is a general provision of the statute covering protections of both welfare benefit plans *and* pension benefit plans. If I accept the plaintiffs' analysis of § 510, which reads continued liability post-transaction or post-reorganization for both welfare and pension benefit plans into the statute, §§ 4069 and 4212(c) would become entirely superfluous. The only reading of § 510 which preserves §§ 4069 and 4212(c) as separate sources of liability is that of the Third Circuit in *Blaw Knox Ret. Income Plan v. White Consol. Indus., Inc.*, which held that no § 510 cause of action is created when a transaction only impacts the financial security of ERISA plans, but does "not affect the participants' eligibility for benefits . . . ." 998 F.2d at 1191; *see also Mattei*, 126 F.3d at 800; *West*, 621 F.2d at 246. Therefore, I **FIND** that the plaintiffs' construction of § 510 would render other sections of ERISA superfluous.

### IV. Conclusion

Because § 510 does not protect the financial integrity of pension funds and because the plaintiffs' interpretation of § 510 would make superfluous other sections of ERISA, Peabody and Arch's motions to dismiss [Dockets 41, 45, 46] are **GRANTED**. As there is no stated claim

under § 510 against the defendants, I need not address the remaining arguments concerning the statute of limitations and necessary parties. Furthermore, Peabody's Motion for Leave to Supplement the Record [Docket 56] is **DENIED as moot** in light of this opinion.

Finally, the defendants' first three motions to dismiss [Dockets 26, 28, 29] were filed before the plaintiffs amended their complaint. Those motions were updated and refiled as the instant motions after the plaintiffs amended their complaint. Therefore, the first three motions to dismiss [Dockets 26, 28, 29] are **DENIED as moot**.

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER: September 27, 2013

JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE